## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Larry Krasner, in his official capacity as the District Attorney of Philadelphia; Office of the District Attorney, City of Philadelphia, | : : : : | |
| Petitioners | : : | |
| v. | : : | |
| Michelle A. Henry, in her official capacity as Attorney General of Pennsylvania, | : : : | No. 8 M.D. 2024 |
| Respondent | : | Argued: April 10, 2024 |

BEFORE:    HONORABLE RENÉE COHN JUBELIRER, President Judge
                 HONORABLE PATRICIA A. McCULLOUGH, Judge
                 HONORABLE ANNE E. COVEY, Judge
                 HONORABLE CHRISTINE FIZZANO CANNON, Judge
                 HONORABLE ELLEN CEISLER, Judge
                 HONORABLE LORI A. DUMAS, Judge
                 HONORABLE MATTHEW S. WOLF, Judge

OPINION
BY JUDGE COVEY[1]                              FILED:  June 14, 2024

        Before this Court are: (1) the Applications for Summary Relief filed by Larry Krasner (DA Krasner) in his official capacity as the District Attorney of Philadelphia and the Office of the District Attorney, City of Philadelphia (collectively, DA) (DA Application), and Michelle A. Henry, in her official capacity as Attorney General (Attorney General) of Pennsylvania (Attorney General Application) (collectively, Cross-Applications); (2) the DA's Petition for Preliminary Injunction (PI Petition) and Emergency Supplemental Application for Preliminary Injunction (Supplemental PI); and (3) the Southeastern Pennsylvania Transportation Authority's (SEPTA) amended petition to intervene (Intervention Petition) with accompanying Proposed Application for Summary Relief (SEPTA Application).

---

[1] This matter was reassigned to the authoring Judge on June 3, 2024.

# I. Background

At the outset,

> [i]n 1963, the General Assembly established SEPTA pursuant to the Metropolitan Transportation Authorities Act [(MTAA)], 74 Pa.C.S. §§ 1701-1785.[FN]2 Th[e MTAA] provides:
>
>> There is hereby authorized the creation of a separate body corporate and politic in each metropolitan area, to be known as the transportation authority of that metropolitan area, extending to and including all of the territory in the metropolitan area.
>
> 74 Pa.C.S. § 1711(a). A "metropolitan area" is defined as "[a]ll of the territory within the boundaries of any county of the first class and all other counties located in whole or in part within 20 miles of the first class county." 74 Pa.C.S. § 1701. Philadelphia is a "county of the first class." *Id.* Consistent with Section 1701, SEPTA operates a mass-transit system in Philadelphia and the four contiguous counties of Bucks, Chester, Delaware, and Montgomery.[2] As a transportation authority, SEPTA exercises the powers of a Commonwealth agency.
>
>> [FN]2 The original [MTAA] has been replaced by the current [MTAA, Act of February 10, 1994, P.L. 20 (1994 Act),[3]] . . . . All transportation authorities are deemed to have been created under the current act. 74 Pa.C.S. § 1711(c)(1).

*Se. Pa. Transp. Auth. v. City of Phila.*, 122 A.3d 1163, 1164-65 (Pa. Cmwlth. 2015), *aff'd*, 159 A.3d 443 (Pa. 2017).

In the 1994 Act, the General Assembly found and declared, *inter alia*:

(a) **Findings**.--

---

[2] "Additionally, [SEPTA] furnishes interstate transportation service between Pennsylvania and the states of Delaware and New Jersey through its Regional Rail Division which operates commuter rail lines traversing all three states." *Goldman v. Se. Pa. Transp. Auth.*, 57 A.3d 1154, 1160 (Pa. 2012).

[3] All references to the MTAA hereafter reflect the current MTAA.

. . . .

(4) The sound planning and development of metropolitan mass transportation facilities in accordance with sound and approved plans for their promotion, development and growth will promote the public health, safety, convenience and welfare, and the public acquisition of existing mass transportation facilities in accordance with the sound plans for their redevelopment and promotion will promote the public health, safety, convenience and welfare.

. . . .

(7) The establishment of metropolitan transportation authorities as authorities of the Commonwealth and the continuance of the existing metropolitan transportation authorities will promote the public safety, convenience and welfare.

. . . .

(b) **Declaration**.--Therefore, it is hereby declared to be the policy of the Commonwealth to promote the safety and welfare of its inhabitants by authorizing the creation or continuation of a body corporate and politic for each metropolitan area, to be known as the transportation authority of such area, which shall exist and operate for the purposes contained in this chapter as an authority of the Commonwealth. These purposes are hereby declared to be public uses for which public money may be spent and private property may be acquired by the exercise of the power of eminent domain.

*Id.* Thus, the Commonwealth's purpose, in part, in establishing SEPTA was to promote the safety and welfare of Commonwealth citizens.

Section 1741(a) of the MTAA states, in relevant part:

(a) **Powers enumerated**.--[SEPTA] shall have and may exercise all powers necessary or convenient for the carrying out of the purposes of this chapter, including the following rights, powers and duties:

(1) To have perpetual existence.

3

74 Pa.C.S. § 1741(a). The MTAA provides for the appointment of SEPTA's board of directors, granting various entities appointment power. *See* Section 1713(a) of the MTAA, 74 Pa.C.S. § 1713(a). Specifically, the Governor may appoint one board member; the Majority Leader and the Minority Leader of the Senate and the Majority Leader and the Minority Leader of the House of Representatives may each appoint one board member; and the county commissioners or the county council in each county and, in Philadelphia, the mayor, with the approval of the city council, may appoint two board members. *See* 74 Pa.C.S. § 1713(a)(1)-(3).

Moreover,

> [u]nder its enabling statute, SEPTA has[, *inter alia*,] (1) a separate corporate existence, [*see*] 74 Pa.[C.S.] § 1711(a); (2) the power to sue and be sued, [*see*] *id*. § 1741(a)(2); and (3) the power to enter into contracts and make purchases on its own behalf, [*see*] *id*. § 1741(a)(8), (9), (12), (18), (20), (21), (22), (24), (25). Other attributes support immunity: (1) its enabling statute provides that **SEPTA "shall in no way be deemed to be an instrumentality of any city or county or other municipality or engaged in the performance of a municipal function**, **but shall exercise the public powers of the Commonwealth as an agency and instrumentality thereof**," *id*. § 1711(a), and "shall continue to enjoy sovereign and official immunity, as provided [by the statutory provisions that comprise and pertain to what is commonly referred to as the Pennsylvania Sovereign Immunity Act],"[4] *id*. § 1711(c)(3); (2) SEPTA has the power of eminent domain, [*see*] *id*. § 1741(a)(13); and (3) SEPTA is immune from state taxation.

*Cooper v. Se. Pa. Transp. Auth.*, 548 F.3d 296, 307 (3d Cir. 2008) (footnotes omitted) (emphasis added); *see also Se. Pa. Transp. Auth*.

On May 9, 2022, the Senate Transportation Committee conducted a public hearing on the Safety and Sustainability of Public Transportation in Pennsylvania. Testimony was presented at the hearing relating to the homelessness, mental illness,

---

[4] 42 Pa.C.S. §§ 8521-8522.

and substance abuse issues that contribute significantly to the number of incidents that SEPTA personnel and riders encounter.[5]

In October 2022, the General Assembly found that, during DA Krasner's time as DA, violent crime and violence in Philadelphia increased, and residents and the economy suffered due to his policies. *See* Select Committee on Restoring Law and Order, Second Interim Report, October 24, 2022 (Select Committee Report). On October 25, 2022, House Bill 140 (Printer No. 3601) was amended to include provisions for the appointment of a special prosecutor authorized to prosecute all crimes within SEPTA. Governor Josh Shapiro (Governor Shapiro) vetoed that bill.

Thereafter, Senator Wayne Langerholc, Jr., Senate Transportation Chair, introduced Senate Bill 140, which included the same provisions as House Bill 140 for the appointment of a special prosecutor authorized to prosecute all crimes within SEPTA. Senate Bill 140 passed the Senate and the House. On December 14, 2023, Governor Shapiro signed Act 40 into law. *See* DA Appl. Ex. 1, Act 40.

Act 40 mandates, in pertinent part:

> Within 30 days of the effective date of this section, the Attorney General shall appoint a special prosecutor to investigate and institute criminal proceedings for a violation of the laws of this Commonwealth occurring within a public transportation authority that serves as the primary provider of public passenger transportation in the county of the first class in accordance with this section.

74 Pa.C.S. § 1786(a).

"Philadelphia presently is the only city of the first class in [this Commonwealth]." *Spahn v. Zoning Bd. of Adjustment*, 977 A.2d 1132, 1143 (Pa. 2009). "There is only one first class county, Philadelphia[.]" *Petition of Berg*, 712 A.2d 340, 344 n.5 (Pa. Cmwlth.), *aff'd*, 713 A.2d 1106 (Pa. 1998); *see Se. Pa. Transp.*

---

[5] *See* https://transportation.pasenategop.com/trans-050922/ (last visited June 14, 2024).

*Auth.*, 122 A.3d at 1165 ("Philadelphia is a first class city that is governed under authority of the First Class City Home Rule Act."[6]). The "public transportation authority that serves as the primary provider of public passenger transportation in the county of the first class" referred to in Act 40 is SEPTA. *See* SEPTA Br. at 9 ("There is no dispute that this 'public transportation authority' is SEPTA.");[7] *see also* DA Appl. Ex. 3, 2023 Pa. Leg. J. Sen. 357 (May 2, 2023) (wherein the discussion focuses solely on SEPTA).

> Act 40 provides that, effective immediately and until December 31, 2026:
>
> Notwithstanding any other provision of law or regulation, a special prosecutor shall have the authority to investigate and prosecute, and has jurisdiction over, any criminal matter involving an alleged violation of the laws of this Commonwealth occurring within [SEPTA]. The special prosecutor's prosecutorial jurisdiction shall include the power and independent authority to exercise all investigative and prosecutorial functions and powers of the [DA] in the county of the first class.

74 Pa.C.S. § 1786(a)(2); *see also* 74 Pa.C.S. § 1786(a)(8) ("No new action or proceeding may be initiated by a special prosecutor under this section after December 31, 2026."); (13) (Act 40 expires as provided in subsection (8)); (14) (The DA and SEPTA "must comply with this section until [it] expires under paragraph (13).").

On or about December 29, 2023, the Attorney General posted a public notice soliciting applications for the Act 40 special prosecutor.[8] On January 8, 2024, the DA's counsel submitted a letter to the Attorney General setting forth reasons why Act 40 was unconstitutional, requesting the opportunity to discuss the law with the

---

[6] Act of April 21, 1949, P.L. 665, *as amended*, 53 P.S. §§ 13101-13157.

[7] "Other mass transit systems operate in Philadelphia and in the counties surrounding Philadelphia County, *e.g.*, New Jersey Transit or [Port Authority Transit Corporation]." DA's Ans. to Intervention Appl. at 3.

[8] *See* Job Bulletin, Pennsylvania Office of Attorney General, Special Prosecutor, https://www.governmentjobs.com/careers/paoag/jobs/newprint/4323346 (last visited June 14, 2024).

Attorney General, and asking that the Attorney General provide assurances by noon on January 10, 2024, that she would not proceed to implement Act 40. *See* Pet. for Rev. Ex. 5. The Attorney General responded that, given the statutory mandate, she is continuing to review potential candidates and does not know when the appointment will occur or when any appointee might begin serving.

On January 11, 2024, the DA filed a petition for review (Petition for Review) in this Court seeking declaratory and injunctive relief on the basis that the special prosecutor's investigative and prosecutorial functions are extensive and encompass the DA's traditional roles and functions. Specifically, the DA alleges: Act 40 unconstitutionally divests the DA of territorial jurisdiction (Claim I); Act 40 unconstitutionally nullifies the DA's core prosecutorial functions (Claim II); Act 40 is an unconstitutional local or special law (Claim III); Act 40 violates the equal protection guarantees of the Pennsylvania Constitution (Claim IV);[9] Act 40 is unconstitutional because it calls for the appointment of an unaccountable special prosecutor (Claim V); Act 40 violates the Criminal History Record Information Act (CHRIA) (Claim VI);[10] and Act 40 impairs the effective prosecution of criminal defendants in Philadelphia by violating their right to raise arguments in their defense (Claim VII). *See* Pet. for Rev. at 29-46. The DA requests: a declaration that Act 40 is unconstitutional and violates CHRIA; permanent and preliminary injunctive relief prohibiting the Attorney General from performing, implementing, or causing any person to perform or implement Act 40; and such other relief as is just and proper. *See id.* at 47-48. The DA claims that he vigorously charges and prosecutes SEPTA crimes, that any decrease in cases is due to sharply decreased SEPTA police arrests, Act 40 does not provide SEPTA with greater resources, and Act 40 is a targeted political action by a legislator who represents a county far from Philadelphia. *See id.* ¶¶ 23-30.

---

[9] Pa. Const. art. I, §§ 1, 26.
[10] 18 Pa.C.S. §§ 9101-9183.

7

On January 17, 2024, the DA filed the PI Petition and a memorandum of law in support thereof. On January 22, 2024, the DA filed an application for an expedited hearing on the PI Petition on the basis that the Attorney General was taking steps to implement Act 40, including soliciting special prosecutor applications.[11] On January 26, 2024, the Attorney General filed an answer opposing the expedited hearing application. On January 31, 2024, the Attorney General filed an answer opposing the PI Petition.

This Court conducted a scheduling conference on February 2, 2024, and that same day issued an Order stating:

> As the parties have agreed that the [PI Petition] filed January 17, 2024, . . . and [the DA's Petition for Review] filed January 11, 2024[,] concern only legal issues and that hearings thereon are not necessary to dispose of the [PI Petition] or the Petition for Review, the parties shall file [Cross-Applications] . . . on or before February 12, 2024. The parties shall file answers to the Cross[-]Applications . . . on or before February 20, 2024.

Feb. 2, 2024 Order at 1. The February 2, 2024 Order further directed the Attorney General to file a response to the Petition for Review and to notify the Court and the DA at least three business days before making any firm offer to a prospective special prosecutor.[12] In addition, this Court scheduled oral argument before the Court *en banc* on the PI Petition and the Cross-Applications for April 10, 2024.

---

[11] By January 24, 2024 letter, the Attorney General notified the DA that, although it intends to uphold its obligation to defend Act 40's constitutionality, the Attorney General was "interested in avoiding the misdirection of resources from the critical law enforcement obligations of both the Office of Attorney General and the [DA's] Office" and "believe[d] it may be beneficial for the Office of Attorney General, the [DA], and SEPTA to schedule a meeting solely to discuss how Act 40 will be implemented and applied." DA Br. Ex. A.

[12] By June 11, 2024 letter, the Attorney General notified this Court that it would be extending a firm employment offer to a special prosecutor candidate on June 14, 2024. Thereafter, on June 12, 2024, the DA filed the Supplemental PI.

The DA and the Attorney General filed the Cross-Applications on February 12, 2024, and, later, briefs in support thereof. On February 20, 2024, SEPTA filed an application to intervene as a party to this matter. Also on February 20, 2024, the DA filed an answer opposing the Attorney General's Application and a reply to the Attorney General's new matter. In addition, the Attorney General filed her answer opposing the DA's Application.

On February 27, 2024, the DA and the Attorney General filed answers opposing SEPTA's intervention application; the DA adding that SEPTA erred by not attaching its proposed pleading. On February 28, 2024, SEPTA filed an application to amend its intervention application to include its proposed pleading, which this Court granted on February 29, 2024. That same day, SEPTA filed its Intervention Petition, attaching the SEPTA Application, therein asking this Court to dismiss the DA's Petition for Review on the bases that: (1) the DA lacks standing; (2) there is no actual controversy, and the DA's claims are not ripe; and (3) the law does not permit recovery on the DA's claims. By March 1, 2024 Order, this Court granted SEPTA leave to participate in oral argument, subject to the Court's disposition of its Intervention Petition.[13]

On March 8, 2024, SEPTA filed a brief in support of its Intervention Petition and Application. The DA's PI Petition and Supplemental PI, the Cross-

___

[13] Also on March 1, 2024, the members of the Pennsylvania Democratic Caucus (Democratic Senators) filed a statement of interest of *amici curiae* supporting the DA's Application, arguing: Act 40 violates article III, section 32 of the Pennsylvania Constitution, PA. CONST. art. III, § 32, prohibiting local or special laws; Act 40 suppresses Philadelphia citizens' votes; and Act 40 falls outside of the Pennsylvania Constitution's exclusive DA removal methods. In addition, on March 1, 2024, the Pennsylvania Senate Republican Caucus and the Pennsylvania House Republican Caucus filed an *amici curiae* brief supporting the Attorney General's Application.

That same day, POWER Interfaith, Pennsylvania Policy Center, Abolitionist Law Center, Common Cause Pennsylvania, Pennsylvania State Conference of the NAACP, NAACP Philadelphia Branch, League of Women Voters of Philadelphia, Make the Road Pennsylvania, and Urban League of Philadelphia filed an application for leave to file an attached amicus brief in support of the DA's Application, which this Court granted on March 4, 2024.

9

Applications, and SEPTA's Intervention Petition and Application are now ready for this Court's disposition.

## II. Discussion

### A. SEPTA

### 1. SEPTA Intervention

Initially, Pennsylvania Rule of Civil Procedure (Rule) 2327 states:

> At any time during the pendency of an action, a person not a party thereto shall be permitted to intervene therein, subject to these rules if
>
> . . . .
>
> (3) such person could have joined as an original party in the action or could have been joined therein; or
>
> (4) the determination of such action may affect any legally enforceable interest of such person[,] whether or not such person may be bound by a judgment in the action.

Pa.R.Civ.P. 2327. Rule 2329 provides:

> [A]n application for intervention may be refused, if
>
> (1) the claim or defense of the petitioner is not in subordination to and in recognition of the propriety of the action; or
>
> (2) the interest of the petitioner is already adequately represented; or
>
> (3) the petitioner has unduly delayed in making application for intervention or the intervention will unduly delay, embarrass[,] or prejudice the trial or the adjudication of the rights of the parties.

Pa.R.Civ.P. 2329.

> This Court has ruled:
>
> [C]onsidering Rules 2327 and 2329 together, the effect of Rule 2329 is that if the petitioner is a person within one of

10

the classes described in Rule 2327, the allowance of intervention is mandatory, not discretionary, unless one of the grounds for refusal under Rule 2329 is present. Equally, if the petitioner does not show himself to be within one of the four classes described in Rule 2327, intervention must be denied, irrespective of whether any of the grounds for refusal in Rule 2329 exist.

*In re Phila. Health Care Tr.*, 872 A.2d 258, 261 (Pa. Cmwlth. 2005) (emphasis omitted) (quoting *Larock v. Sugarloaf Twp. Zoning Hearing Bd.*, 740 A.2d 308, 313 (Pa. Cmwlth. 1999)).

Moreover,

[t]o intervene, the prospective intervenor must first establish that [it] has standing. *Markham* [*v. Wolf*], 136 A.3d [134,] 140 [(Pa. 2016)]. . . . [F]or a party to a legal action to have standing, they must be aggrieved or "negatively impacted in some real and direct fashion." *Pittsburgh Palisades Park, LLC v. Commonwealth*, . . . 888 A.2d 655, 660 ([Pa.] 2005).

*Allegheny Reprod. Health Ctr. v. Pa. Dep't of Hum. Servs.*, 309 A.3d 808, 843-44 (Pa. 2024) (footnote omitted).

In support of its Intervention Petition, SEPTA avers:

SEPTA "could have joined as an original party in this suit, or could have been joined therein[,]" because Act 40 directly pertains to SEPTA. Pa.R.Civ.P. 2327(3). As the "public transportation authority that serves as the primary provider of public passenger transportation in the county of the first class," SEPTA is directly contemplated by Act 40. 74 P.S. § 1786(a).

. . . .

Second, any determination in this action will affect SEPTA's legally enforceable interests. [The DA] seek[s] [] declaratory and injunctive relief that, if granted, will entirely stop enforcement of Act 40. . . . Act 40 directly speaks to the investigation, prosecution, and enforcement of crimes committed occurring within SEPTA. Any relief granted related to Act 40 will necessarily implicate SEPTA.

11

Intervention Petition at 5-6.

This Court agrees with SEPTA. Importantly, Act 40 applies directly to "violation[s] of the laws of this Commonwealth occurring **within a public transportation authority** that serves as the primary provider of public passenger transportation in the county of the first class." 74 Pa.C.S. § 1786(a) (emphasis added). It further provides, in relevant part: "The Attorney General, the county of the first class, the [DA] of the first class[,] and **the public transportation authority** that serves as the primary provider of public passenger transportation in the county of the first class **must comply with this section** until this section expires . . . ." 74 Pa.C.S. § 1786(a)(14) (emphasis added). Thus, a decision in this matter will impact SEPTA in "some real and direct fashion." *Pittsburgh Palisades*, 888 A.2d at 660. Accordingly, this Court grants SEPTA's Intervention Petition, and considers the SEPTA Application.

## 2. SEPTA Application – DA's Standing

SEPTA argues that the DA is not aggrieved by Act 40 to the extent that the special prosecutor lacks accountability to the electorate or that he may violate rights of future unidentified criminal defendants. Specifically, it contends that the DA's interest is not substantial because it does not surpass the common interest of all citizens, and alleged unequal treatment of Philadelphia voters and potential criminal defendants is not a direct harm to the DA. Further, according to SEPTA, the DA's interest is not immediate because the Attorney General has not yet appointed a special prosecutor, so no investigations or prosecutions under Act 40 are imminent. Finally, SEPTA asserts that the DA lacks standing to assert a claim that the electorate's right to select or remove a prosecutor is infringed because that right belongs solely to the electorate.

12

"Standing is [also] a justiciability concern, implicating a court's ability to adjudicate a matter."[14] *Firearm Owners Against Crime v. Papenfuse*, 261 A.3d 467, 481 (Pa. 2021) (*FOAC II*). "In seeking judicial resolution of a controversy, a party must establish as a threshold matter that he has standing to maintain the action." *Stilp v. Gen. Assembly*, 940 A.2d 1227, 1233 (Pa. 2007). "[T]he core concept of standing is that a person who is not adversely affected in any way by the matter he seeks to challenge is not aggrieved thereby and has no standing to obtain a judicial resolution of his challenge." *Fumo v. City of Phila.*, 972 A.2d 487, 496 (Pa. 2009). "An individual can demonstrate that he has been aggrieved if he can establish that he has a substantial, direct[,] and immediate interest in the outcome of the litigation." *Id*.

> A substantial interest in the outcome of litigation is one that surpasses the common interest of all citizens in procuring obedience to the law. A direct interest requires a causal connection between the asserted violation and the harm complained of. An interest is immediate when the causal connection is not remote or speculative.

*Phantom Fireworks Showrooms, LLC v. Wolf*, 198 A.3d 1205, 1215 (Pa. Cmwlth. 2018) (citations omitted). "Under Pennsylvania law, the doctrine of standing is 'a prudential, judicially-created tool,' affording discretion to courts." *FOAC II*, 261 A.3d at 481 (quoting *In re Hickson*, 821 A.2d 1238 (Pa. 2003)).

In the Petition for Review, the DA asserts that he is being stripped of his statutory responsibilities for SEPTA-related crimes. He further maintains that as Philadelphia County's elected chief law enforcement officer, his interest surpasses the

---

[14] [T]his Court has noted that the justiciability doctrines of standing and ripeness are closely related because both may encompass allegations that the plaintiff's harm is speculative or hypothetical and resolving the matter would constitute an advisory opinion. However, ripeness is distinct from standing as it addresses whether the factual development is sufficient to facilitate a judicial decision.

*Firearm Owners Against Crime v. Papenfuse*, 261 A.3d 467, 482 (Pa. 2021) (citations omitted).

common interest of all citizens in procuring obedience to the law. It cannot be disputed that the DA has a duty and, thus, a substantial interest in investigating and prosecuting crimes in Philadelphia County, including within SEPTA. Such interest is clearly affected by Act 40. The causal connection is also clear. The impact upon the DA's duties results directly from Act 40's mandates and the effect on his interest was immediate with Act 40's passing. Thus, **the DA has standing on his own behalf**.[15] *See Krasner v. Ward* (Pa. Cmwlth. No. 563 M.D. 2022, filed Jan. 12, 2023) (*Krasner I*) ("It is entirely unreasonable under the circumstances for Impeachment Managers to

---

[15] In the Petition for Review, the DA appears to assert claims on the Philadelphia electorate's behalf by asserting that Act 40 undermines the electorate's choice of prosecutor (who does not even take an oath) and the special prosecutor is insulated from accountability to the electorate, *see* Petition for Rev. ¶¶ 147, 151-153. However, those statements are made as part of the DA's equal protection (Claim IV) and unconstitutional unaccountability claims (Claim V) as examples of how Act 40 strips him of his prosecutorial authority. Accordingly, the DA does not purport to have standing to bring this action on behalf of Philadelphia voters. However, to the extent the Petition for Review may reflect that the DA is bringing the action on that basis, he lacks standing.

Regarding the DA's CHRIA violation claims asserted in Claim VI of the Petition for Review, *see* ¶¶ 160-161, although CHRIA authorizes individuals aggrieved by CHRIA violations to seek damages, costs, and fees, *see Hunt v. Pa. State Police*, 983 A.2d 627 (Pa. 2009), the DA's claims are limited to Act 40's requirement that the DA disseminate investigative information to the special prosecutor without regard for CHRIA's specific disclosure requirements. Accordingly, the DA does not purport to have standing to bring a CHRIA violation action on potential criminal defendants' behalf. To the extent the Petition for Review may reflect that the DA is bringing the action on that basis, he lacks standing.

Relative to the DA's claim that Act 40 impairs criminal defendants' rights to raise the special prosecutor's jurisdiction in their defense, Act 40 provides:

> No person charged with a violation of the law by a special prosecutor shall have standing to challenge the authority of the special prosecutor to prosecute the case. If a challenge is made, the challenge shall be dismissed and no relief shall be available in the courts of this Commonwealth to the individual making the challenge.

74 Pa.C.S. § 1786(a)(5). In the Petition for Review, while the DA discusses the unconstitutional infringing of criminal defendants' rights, *see* ¶ 165, he does so in terms of the effect of complicating criminal prosecutions, possible dismissals, and potential increase in crimes. Accordingly, the DA does not purport to have standing to bring potential criminal defendants' rights violation claims on their behalf. However, to the extent the Petition for Review may reflect that the DA is bringing the action on that basis, he lacks standing.

14

assert that [the DA] lacks standing. The [government action is] targeted squarely at him and [is] part of the broader, continuing effort by the General Assembly to potentially remove him from office." Slip op. at 15).

### 3. SEPTA Application – Actual Controversy/Ripeness

SEPTA contends that the matter is not ripe for this Court's intervention because the Attorney General has not yet appointed a special prosecutor, and therefore, no one is exercising authority under Act 40. Thus, according to SEPTA, there is not yet an actual controversy.

"Declaratory judgments are . . . judicial searchlights, switched on at the behest of a litigant to illuminate an existing legal right, status or other relation." *Selective Way Ins. Co. v. Hosp. Grp. Servs., Inc.*, 119 A.3d 1035, 1046 (Pa. Super. 2015) (quoting *Wagner v. Apollo Gas Co.*, 582 A.2d 364, 365 (Pa. Super. 1990) (citation omitted)). They are governed by the provisions of the Declaratory Judgments Act, 42 Pa.C.S. §§ 7531-7541.

> The purpose of the Declaratory Judgments Act "is to settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations, and [it] is to be liberally construed and administered."[16] 42 Pa.C.S. § 7541. Declaratory judgment as to the rights, status or legal relationships is appropriate only where an actual controversy exists. *McCord v. Pennsylvanians for Union Reform*, 136 A.3d 1055 (Pa. Cmwlth. 2016). "An actual controversy exists when litigation is both imminent and inevitable and the declaration sought will practically help to end the controversy between the parties." *Id*. at 1061 (quotation omitted).

*Eleven Eleven Pa., LLC v. State Bd. of Cosmetology*, 169 A.3d 141, 145 (Pa. Cmwlth. 2017); *see also Off. of Governor v. Donahue*, 98 A.3d 1223, 1229 (Pa. 2014) ("[T]he

---

[16] "The declaration may be either affirmative or negative in form and effect, and . . . shall have the force and effect of a final judgment or decree." 42 Pa.C.S. § 7532.

courts of this Commonwealth are generally proscribed from rendering decisions in the abstract or issuing purely advisory opinions.").

However, the Declaratory Judgments Act is to be liberally construed, *see* 42 Pa.C.S. § 7541(a), and "[t]he subject matter of the dispute giving rise to a request for declaratory relief need not have erupted into a full-fledged battle . . . ." *Pa. Game Comm'n v. Seneca Res. Corp.*, 84 A.3d 1098, 1103 (Pa. Cmwlth. 2014) (quoting *Ronald H. Clark, Inc. v. Twp. of Hamilton*, 562 A.2d 965, 968 (Pa. Cmwlth. 1989)).

[O]ur Supreme Court has said:

> 'If differences between the parties concerned, as to their legal rights, have reached the state of antagonistic claims, which are being actively pressed on one side and opposed on the other, an actual controversy appears; where, however, the claims of the several parties in interest, while not having reached the active stage, are nevertheless present, and indicative of threatened litigation in the immediate future, which seems unavoidable, the ripening seeds of a controversy appear.'

*Pa. Game Comm'n*, 84 A.3d at 1103-04 (quoting *Mid-Centre Cnty. Auth. v. Boggs Twp.*, 384 A.2d 1008, 1011 (Pa. Cmwlth. 1978)). Therefore, while an issue giving rise to a request for a declaratory judgment must be justiciable, it need not be in litigation. *See Pa. Game Comm'n*. Moreover, the Pennsylvania Supreme Court has concluded that a question of law, like that presented here, is "particularly well-suited for pre-enforcement review." *Yocum v. Pa. Gaming Control Bd.*, 161 A.3d 228, 237 (Pa. 2017) (quoting *Robinson Twp., Wash. Cnty. v. Commonwealth*, 83 A.3d 901, 917 (Pa. 2013)).

Act 40 directs that, within 30 days of December 14, 2023, the Attorney General shall appoint a special prosecutor to investigate and institute criminal proceedings for a violation of the laws of this Commonwealth occurring within a public transportation authority that serves as the primary provider of public passenger transportation (i.e., SEPTA) in the county of the first class (i.e., Philadelphia County)

until December 31, 2026. *See* 74 Pa.C.S. § 1786(a). The Attorney General admitted to the DA that she is statutorily mandated to find and hire a special prosecutor who will take the DA's place in the investigation and prosecution of criminal matters involving SEPTA. *See* Pet. for Rev. ¶ 82; *see* AG Ans. & N.M. ¶ 82. The job listing is still posted, and the Attorney General's Office has informed this Court that it has made a firm employment offer to a candidate subject only to a background check, which the Attorney General has advised this Court the candidate has passed. Accordingly, this Court concludes that "[a]n actual controversy exists [that] is both imminent and inevitable and the declaration sought will practically help to end the controversy between the parties." *Eleven Eleven Pa.*, 169 A.3d at 145 (quoting *McCord*, 136 A.3d at 1061).

## B. Summary Relief

### 1. Constitutionality in General

The law is well settled that

> [t]he standard for granting summary relief turns upon whether the applicant's right to relief is clear. Summary relief on a petition for review is similar to the relief provided by a grant of summary judgment. [*See*] Pa.R.A.P. 1532, Official Note. Summary judgment is appropriate where, after the close of pleadings, "there is no genuine issue of any material fact as to a necessary element of the cause of action or defense which could be established by additional discovery or expert report." Pa.R.C[iv].P. 1035.2(a). The record is to be viewed in the light most favorable to the nonmoving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party.

*Scarnati v. Wolf*, 173 A.3d 1110, 1118 (Pa. 2017) (footnote omitted).

The Pennsylvania Supreme Court has explained:

> Acts passed by the General Assembly enjoy a strong presumption of constitutionality, and a challenging party

17

bears a very heavy burden of persuasion. *Stilp v. . . . Gen. Assembly*, . . . 974 A.2d 491, 495 ([Pa.] 2009). A statute must violate an express or clearly implied prohibition in the Constitution before it will be held unconstitutional. *Russ v. Commonwealth*, . . . 60 A. 169, 172 ([Pa.] 1905); *Sharpless v. Mayor of Phila*[.], 21 Pa. 147, 164 (1853) (explaining that legislation is void "only when it violates the constitution clearly, palpably, plainly; and in such manner as to leave no doubt or hesitation on our minds[]"). If any doubt arises, it is resolved in favor of the constitutionality of the legislation. *Russ*, 60 A. at 172.

*McLinko v. Commonwealth*, 279 A.3d 539, 565 (Pa. 2022). "[This Court] presume[s] that the General Assembly does not intend to violate the Pennsylvania Constitution, nor intend an absurd or unreasonable result." *Id*. at 563. Thus, "statutes are to be construed whenever possible to uphold their constitutionality." *Working Families Party v. Commonwealth*, 209 A.3d 270, 279 (Pa. 2019) (quoting *DePaul v. Commonwealth*, 969 A.2d 536, 545-46 (Pa. 2009)).

Further,

[t]he judiciary can only arrest the execution of a statute when it conflicts with the Constitution. It cannot run a race of opinions upon points of right, reason, and expediency with the lawmaking power. . . . If the courts are not at liberty to declare statutes void because of their apparent injustice or impolicy, neither can they do so because they appear to the minds of the judges to violate fundamental principles of republican government, unless it should be found that these principles are placed beyond legislative encroachment by the Constitution.

*Russ*, 60 A. at 173 (quoting COOLEY ON CONSTITUTIONAL LIMITATIONS, [cl]. 7, §§ 4, 5 (6th ed. 1890)).

*Wolf v. Scarnati*, 233 A.3d 679, 706 (Pa. 2020) (superseded by constitutional amendment on other grounds).

Before addressing the DA's arguments, it is important to understand the Commonwealth of Pennsylvania's (Commonwealth) governmental structure.

18

> The Pennsylvania Constitution, since its inception in 1776, has created a framework of government vesting legislative, judicial, and executive powers in three separate branches. This tripartite structure, with its system of checks and balances among these branches, is designed to prevent a concentration of power in any one branch and to prevent one branch from exercising the core functions of another — the embodiment of the separation of powers doctrine. *See Commonwealth v. Mockaitis*, . . . 834 A.2d 488, 499 ([Pa.] 2003). Foundationally, the legislature creates the laws. PA. CONST. art. II, § 1. The judiciary interprets the laws. PA. CONST. art. V, § 1. Finally, [a]rticle IV, [s]ection 2 of our charter provides the Governor "supreme executive power" to implement the laws of the Commonwealth. PA. CONST. art. IV, § 2.

*Markham v. Wolf*, 190 A.3d 1175, 1177 (Pa. 2018).

Within the above-described framework of state government, the Pennsylvania Constitution expressly authorizes the General Assembly to create local forms of government, which the Pennsylvania Constitution refers to as municipalities. The Pennsylvania Constitution explicitly defines "municipality" as "a county, city, borough, incorporated town, township or any similar general purpose unit of government which shall hereafter be **created by the General Assembly**." PA. CONST. art. IX, § 14, titled "Local Government" (emphasis added).

The Pennsylvania Supreme Court has described:

> Municipalities are creatures of the state and have no inherent powers of their own, *see Naylor v. [Twp.] of Hellam*, . . . 773 A.2d 770, 773 ([Pa.] 2001); rather, they "possess only such powers of government as are expressly granted to [them] and as are necessary to carry the same into effect." *Appeal of Gagliardi*, . . . 163 A.2d 418, 419 ([Pa.] 1960); *see also Phila[.] v. Fox*, 64 Pa. (14 Smith) 169, 180-81 (1870). Therefore, a municipality ordinarily lacks the power to enact ordinances except as authorized by statute, and any ordinance not in conformity with its enabling statute is void. *See Taylor v. Abernathy*, . . . 222 A.2d 863, 865 ([Pa.] 1966).

*City of Phila. v. Schweiker*, 858 A.2d 75, 84 (Pa. 2004).

19

The Pennsylvania Constitution specifically permits a municipality to govern by a home rule charter and, in doing so, expressly authorizes the General Assembly to limit a home rule municipality's power. Article IX, section 2 of the Pennsylvania Constitution, titled "Home Rule[,]" provides:

> Municipalities shall have the right and power to frame and adopt home rule charters. . . . **A municipality which has a home rule charter may exercise any power or perform any function not denied** by this Constitution, by its home rule charter[,] or **by the General Assembly at any time**.

PA. CONST. art. IX, § 2 (emphasis added).

In discussing this constitutional provision, the Pennsylvania Supreme Court instructed:

> By virtue of this [constitutional] revision, any power that the General Assembly did not forbid was now extended to any municipality that - like the City of [Philadelphia] - adopted home rule. *See . . . Schweiker*, . . . 858 A.2d [at] 84 . . . (holding that, "[u]nder the concept of home rule, . . . the locality in question may legislate concerning municipal governance without express statutory warrant for each new ordinance," **provided it does so in a fashion allowed by its home rule charter and without running afoul of** the Pennsylvania Constitution or **state statutory law**).

*Pa. Rest. & Lodging Ass'n v. City of Pittsburgh*, 211 A.3d 810, 816-17 (Pa. 2019) (emphasis added); *see also Schweiker*, 858 A.2d at 84 ("Under the concept of home rule, however, the locality in question may legislate concerning municipal governance without express statutory warrant for each new ordinance; rather, **its ability to exercise municipal functions is limited only by** its home rule charter, the Pennsylvania Constitution, and **the General Assembly**.") (emphasis added).

Article IX, section 4 of the Pennsylvania Constitution, titled "County Government[,]" specifically distinguishes home rule municipalities from county

20

government, and expressly states that the constitutional provisions for county government do <u>not</u> apply to a home rule municipality. That provision reads:

> County officers shall consist of commissioners, controllers or auditors, district attorneys, public defenders, treasurers, sheriffs, registers of wills, recorders of deeds, prothonotaries, clerks of the courts, and such others as may from time to time be provided by law.
>
> . . . .
>
> **Provisions for county government in this section shall apply to every county except a county which has adopted a home rule charter or an optional form of government**. One of the optional forms of county government provided by law shall include the provisions of this section.

PA. CONST. art. IX, § 4 (emphasis added).

"Philadelphia presently is the only city of the first class in [this Commonwealth]." *Spahn*, 977 A.2d at 1143. Philadelphia is governed by a home rule charter which it adopted in 1951. *See Se. Pa. Transp. Auth.*, 122 A.3d at 1165 ("Philadelphia is a first class city that is governed under authority of the First Class City Home Rule Act.").

In further separating Philadelphia's home rule municipality from county government, article IX, section 13 of the Pennsylvania Constitution, titled, "Abolition of county offices in Philadelphia[,]" abolished all county offices in Philadelphia, directed that all Philadelphia county officers shall be City of Philadelphia officers, and provided that special laws regulating the affairs of the City of Philadelphia shall be valid. That constitutional provision states:

> (a) In Philadelphia all county offices are hereby abolished, and the city shall henceforth perform all functions of county government within its area through officers selected in such manner as may be provided by law.
>
> (b) Local and **special laws**, **regulating the affairs of the City of Philadelphia and creating offices or prescribing**

21

**the powers and duties of officers of the City of Philadelphia**, **shall be valid** notwithstanding the provisions of section thirty-two of [a]rticle III of this Constitution.

(c) All laws applicable to the County of Philadelphia shall apply to the City of Philadelphia.

(d) The City of Philadelphia shall have, assume and take over all powers, property, obligations and indebtedness of the County of Philadelphia.

(e) The provisions of section two of this article shall apply with full force and effect to the functions of the county government hereafter to be performed by the city government.

(f) Upon adoption of this amendment **all county officers shall become officers of the City of Philadelphia**, **and until the General Assembly shall otherwise provide**, **shall continue to perform their duties** and be elected, appointed, compensated and organized in such manner as may be provided by the provisions of this Constitution and the laws of the Commonwealth in effect at the time this amendment becomes effective, but such officers serving when this amendment becomes effective shall be permitted to complete their terms.

PA. CONST. art. IX, § 13 (emphasis added).

The Pennsylvania Constitution, in expressly authorizing the General Assembly to create home rule municipalities, clearly states that a home rule municipality's ability to govern is limited by the Pennsylvania Constitution, its home rule charter, **and the General Assembly**. In accordance with well-established law, municipalities do not have free reign over the sovereign which created them. Accordingly, the General Assembly "retains express constitutional authority to limit the scope of any municipality's home rule governance[.]" *Schweiker*, 858 A.2d at 87.

In addition to the Pennsylvania Constitution establishing this Commonwealth's governmental structure, it is also important to note what the Pennsylvania Constitution does not state. Pertinent to the matter before this Court, the

22

Pennsylvania Constitution does not expressly or by clear implication grant a district attorney in a home rule municipality any power; rather, it is silent, and it certainly does not bestow any authority upon that officer greater than the Pennsylvania Constitution gives to the General Assembly which created the municipality. *See Commonwealth v. McHale*, 97 Pa. 397, 406 (1881) ("While **the legislature** may not abolish the office [of district attorney], it **can control the officer**. [**The legislature**] **can regulate the performance of his duties**,[17] and punish him for misconduct, as in the case of other officers.") (emphasis added); *see also In re Ajaj*, 288 A.3d 94, 113 n.3 (Pa. 2023) (Dougherty, J., concurring) (wherein Justice Dougherty characterized the Court's decision in *McHale* as "arguably consider[ing] a separations of powers claim . . . within the context of assessing the permissible bounds of legislative, rather than judicial, encroachment on prosecutorial powers[,]" and describing the *McHale* Court as "holding 'the legislature may not abolish the office' [of district attorney] but 'it can control the officer' by 'regulat[ing] the performance of his duties' and 'punish[ing] him for misconduct[.]'") (quoting *McHale*, 97 Pa. at 406); *In re Shelley*, 2 A.2d 809, 812 (Pa. 1938) ("[I]t is well established that since the [Pennsylvania] Constitution does not prescribe the duties of the district attorney[,] the legislature may regulate the performance of such duties and provide for cases in which it would be improper for the elected officer to act.");[18] *Commonwealth v. Lehman*, 164 A. 526, 527 (Pa. 1932) ("As

---

[17] As indicative of the General Assembly's ability to regulate a district attorney's duties, the General Assembly has previously authorized the Attorney General to supersede the DA in certain specific instances. *See Pa. Rest. & Lodging Ass'n*.

[18] The Dissent references *Shelley* and *Commonwealth v. Schab*, 383 A.2d 819, 821 (Pa. 1978), as cases involving statutorily permitted supersession subject to judicial approval. The Dissent states:

> Act 40 is nothing like the supersession statutes in *Shell*[e]*y* and *Schab*, or the modern Commonwealth Attorneys Act [(CAA), Act of October 15, 1980, P.L. 950, *as amended*, 71 P.S. §§ 732-101 - 732-506]. It contains no process for reviewing the special prosecutor's decision to assert preemptive jurisdiction, let alone any opportunity for [DA]

the [Pennsylvania] Constitution does not prescribe the duties of the district attorney, it has been held that the legislature may regulate the performance of the duties of the office and provide for cases in which it would be improper for the elected officer to act."). Pursuant to its constitutional authority, the General Assembly passed Act 40 and Governor Shapiro signed it into law.

## 2. DA Application Claim I -
## Act 40 Divests the DA of Territorial Jurisdiction

The DA argues that article IX, section 4 of the Pennsylvania Constitution grants county district attorneys' jurisdiction coextensive with the boundaries of their respective counties. Further, the DA asserts that the DA's territorial jurisdiction is the entirety of Philadelphia County. He also contends that Act 40's "vague[]" grant of jurisdiction to the special prosecutor "'within' SEPTA" further evidences Act 40's intrusion upon the DA's territorial jurisdiction.[19] DA Br. at 31. Accordingly, the DA

---

> Krasner to be heard on that question, as the *Shelley* Court conspicuously required. There is no way to say **whether the special prosecutor**'s assertion of jurisdiction is "**valid**," *Shelley*, 2 A.2d at 814, because Act 40 does not care whether it is valid.

*Krasner v. Henry*, ____ A.3d ___, ___ (Pa. Cmwlth. No. 8 M.D. 2024, filed June 14, 2024) (Wolf, J., dissenting) (DO), slip op. at 8 (emphasis added). Critically, **under Act 40**, **there is no question as to whether the special prosecutor**'s **jurisdiction is valid**. Unlike in *Shelley* and *Schab*, the General Assembly, through Act 40, has granted the special prosecutor "jurisdiction over[] **any** criminal matter involving an alleged violation of the laws of this Commonwealth occurring within a public transportation authority that serves as the primary provider of public passenger transportation in the county of the first class." 74 Pa.C.S. § 1786(a)(2) (emphasis added). The General Assembly granted the special prosecutor such jurisdiction regardless of whether the special prosecutor chooses to exercise it. Accordingly, the Dissent's reliance on *Shelley* and *Schab* is unconvincing.

[19] The DA argues: "the vagueness of one of Act 40's key phrases - 'within' SEPTA in Philadelphia - reinforces the conclusion that the Act impermissibly infringes on [the DA's] territorial jurisdiction." DA Br. at 31. The Pennsylvania Supreme Court has held: "'[I]t is incumbent . . . to state, at least in somewhat express terms, the specific constitutional grounds upon which the challenger is basing its attack on the legislation.' *In re F.C. III*, 2 A.3d [1201,] 1212 [(Pa. 2010)]." *HIKO Energy, LLC v. Pa. Pub. Util. Comm'n*, 209 A.3d 246, 263 (Pa. 2019). Importantly, the DA

24

maintains that Act 40's special prosecutor is constitutionally prohibited from intruding into his territorial jurisdiction.

Further, article IX, section 4 of the Pennsylvania Constitution, by its explicit terms, **does not apply to home rule municipalities**. Article IX, section 4 of the Pennsylvania Constitution states: "Provisions for county government in this section shall apply to every county **except a county which has adopted a home rule charter** or an optional form of government." PA. CONST. art. IX, § 4 (emphasis added). Thus, notwithstanding that article IX, section 4 of the Pennsylvania Constitution identifies district attorneys as county officers, that provision does not apply to a county that has adopted home rule, i.e., Philadelphia.

Moreover, article IX, section 13(f) of the Pennsylvania Constitution declared upon adoption of the amendment that "all county officers shall become officers of the City of Philadelphia . . . ." PA. CONST. art. IX, § 13(f). In fact, in *McMenamin v. Tartaglione*, 590 A.2d 802 (Pa. Cmwlth.), *aff'd without opinion*, 590 A.2d 753 (Pa. 1991), this Court determined "that [the DA] was a City officer . . . ." *Id*. at 807-08. The Pennsylvania Constitution does not prescribe the DA's duties. *See Shelley*; *see also McHale*. Article IX, section 2 of the Pennsylvania Constitution provides municipalities with the right to frame and adopt home rule charters. That section further states that municipalities "may exercise any power or perform any function not denied by . . . the General Assembly at any time." PA. CONST. art. IX, § 2. The General Assembly "retains express constitutional authority to limit the scope of any municipality's home rule governance[.]" *Schweiker*, 858 A.2d at 87. Contrary to the DA's assertion, Act 40 does not violate article IX, section 4 of the Pennsylvania

---

has not asserted or developed a constitutional void for vagueness challenge or requested this Court to declare that Act 40 is void for vagueness. Accordingly, this Court does not address a constitutional vagueness challenge.

Constitution, as that section does not contain an express or implied prohibition relating to the General Assembly affecting the DA's territorial jurisdiction.[20] Accordingly, Act 40 does not clearly, palpably, and plainly violate the Pennsylvania Constitution as it does not intrude upon the DA's territorial jurisdiction.[21]

Significantly, the General Assembly created SEPTA. SEPTA "extend[s] to and include[s] all of the territory in the metropolitan area." 74 Pa.C.S. § 1711(a).

---

[20] Section 206(a) of the CAA provides: "The Attorney General shall be the chief law enforcement officer of the Commonwealth; the district attorney shall be the chief law enforcement officer for the county in which he is elected." 71 P.S. § 732-206(a).

[21] The Concurrence/Dissent would find Act 40 unconstitutional as an improper delegation of legislative authority. However, the DA did not argue that Act 40 improperly delegates legislative authority, did not mention the term "delegation" in its brief, and did not reference the seminal case on that issue - *Protz v. Workers' Compensation Appeal Board (Derry Area School District)*, 161 A.3d 827 (Pa. 2017), or any subsequent case addressing improper delegation of legislative authority. Because constitutional issues can be waived, the Court may not raise them *sua sponte*. *See Commonwealth v. Berryman*, 649 A.2d 961 (Pa. Super. 1994).

The Concurrence/Dissent nevertheless, *sua sponte*, observes, with respect to the DA's argument that Act 40's use of the purportedly vague term "within" improperly impacted his territorial jurisdiction, "[t]hat argument is fairly and properly understood as challenging the General Assembly's impermissible delegation of its legislative authority." *Krasner v. Henry*, ___ A.3d ___, ___ (Pa. Cmwlth. No. 8 M.D. 2024, filed June 14, 2024) (Fizzano Cannon, J., concurring/dissenting) (CO/DO), slip op. at 3. "'[I]t is incumbent . . . to state, at least in somewhat express terms, the specific constitutional grounds upon which the challenger is basing its attack on the legislation.' *In re F.C. III*, 2 A.3d at 1212." *HIKO Energy, LLC*, 209 A.3d at 263. The Concurrence/Dissent essentially concludes that the DA ***meant*** to argue improper delegation of authority when he asserted that Act 40's use of the term "within" improperly impacted his territorial jurisdiction.

"This Court may n[ot] litigate for the parties . . . ." *Dice v. Chocha-Pipan*, 304 A.3d 41, 44 (Pa. Super. 2023). Further,

> [t]his Court declared in *Department of Transportation, Bureau of Traffic Safety v. Malone*, 520 A.2d 120 (Pa. Cmwlth. 1987),
>
>> while it is among the functions of the trial court to clarify the issues, that function does not cast it in the role of advocate. Accordingly, [the Pennsylvania Supreme Court in *Hrivnak v. Perrone*, . . . 372 A.2d 730 (Pa. 1977),] held that it [is] error for a trial judge to introduce theories not raised by the parties.
>
> *Malone*, 520 A.2d at 122.

*Omatick v. Cecil Twp. Zoning Hearing Bd.*, 286 A.3d 413, 430-431 (Pa. Cmwlth. 2022).

"A 'metropolitan area' is defined as "[a]ll of the territory within the boundaries of any **county of the first class** and all other counties located in whole or in part within 20 miles of the first class county." 74 Pa.C.S. § 1701 (emphasis added). Moreover,

> [t]his transportation system is purposed to operate for the benefit of citizens of the Commonwealth and ultimately the Commonwealth itself, as SEPTA is the Commonwealth's Authority providing public transportation in and around the Commonwealth's largest metropolitan area. . . . SEPTA plays a substantial role in providing transportation for the area's workforce, to and from their various places of employment, thus contributing substantially to the generation of the Commonwealth's revenue.

*Davis v. Se. Pa. Transp. Auth.*, 980 A.2d 709, 713 (Pa. Cmwlth. 2009), *rev'd on other grounds sub nom. Goldman v. Se. Pa. Transp. Auth.*, 57 A.3d 1154 (Pa. 2012).

The 1994 Act found that the establishment and continuance of transportation authorities "will promote the public health, safety, convenience and welfare[.]" *Id.* The 1994 Act further stated:

> [I]t is hereby declared to be the policy of the Commonwealth to promote the safety and welfare of its inhabitants by authorizing the creation or continuation of a body corporate and politic for each metropolitan area, to be known as the transportation authority of such area, which shall exist and operate for the purposes contained in this chapter as an authority of the Commonwealth.

*Id.* Accordingly, as a Commonwealth-created entity, the General Assembly has authority to regulate SEPTA, and Act 40, as an amendment to the MTAA, clearly implements the General Assembly's stated findings and declarations. *See* 74 Pa.C.S. §§ 1711(a); 1701.

27

### 3. DA Application Claim II -
### Act 40 Nullifies the DA's Core Prosecutorial Functions

The DA asserts that Act 40 impermissibly infringes on the DA's authority to prosecute crimes under state law that occur within Philadelphia County. Further, the DA asserts that the Attorney General's/special prosecutor's authority provided in Act 40 does not fall under the narrowly circumscribed supersession circumstances in Section 205(a) of the CAA.[22]

> "[D]istrict attorneys in this Commonwealth have the power - and the duty - to represent the Commonwealth's interests in the enforcement of its *criminal laws*." [*Commonwealth ex rel. Specter v.*] *Bauer*, 261 A.2d [573,] 575 [(Pa. 1970)]. "[T]he [DA] is statutorily and constitutionally responsible for law enforcement at the local level . . . ." [*Commonwealth v.*] *Schab*, 383 A.2d [819,] 824 [(Pa. 1978)]. Thus, in criminal matters, the district attorneys are the primary authority for criminal prosecution.

*Commonwealth by & through Krasner v. Att'y Gen.*, 309 A.3d 265, 276 (Pa. Cmwlth. 2024) (emphasis in original).

---

[22] Until Act 40, "the [CAA] [wa]s the only legislation delineating the powers of the Attorney General." *Commonwealth. v. Carsia*, 491 A.2d 237, 247 (Pa. Super. 1985), *aff'd*, 517 A.2d 956 (Pa. 1986).

The CAA,

> which empowers specific entities to represent the Commonwealth in legal matters . . . permits the replacement of one prosecutor with another in at least three circumstances. First, the Attorney General may petition a court to permit his or her office to supersede [a] district attorney in any criminal action. [*See* Section 205(a)(4) of the CAA, 71 P.S. § 732-205(a)(4).] Second, the president judge of a particular county may request that the Attorney General supersede [a] district attorney in a criminal proceeding. [*See* Section 205(a)(5) of the CAA, 71 P.S. § 732-205(a)(5).] Third, a district attorney's office may refer a case to the Attorney General for prosecution whenever the office lacks adequate resources or has a conflict of interest. [*See* Section 205(a)(3) of the CAA, 71 P.S. § 732-205(a)(3).]

*Commonwealth v. Mayfield*, 247 A.3d 1002, 1006 (Pa. 2021) (footnotes omitted).

The prosecutor enjoys "tremendous" discretion to wield "the power to decide whether to initiate formal criminal proceedings, to select those criminal charges which will be filed against the accused, to negotiate plea bargains, to withdraw charges where appropriate, and, ultimately, to prosecute or dismiss charges at trial." [*Commonwealth v.*] *Clancy*, 192 A.3d [44,] 53 [(Pa. 2019)]. Unless patently abused, this vast discretion is exercised generally beyond the reach of judicial interference. *See* [*Commonwealth v.*] *Stipetich*, 652 A.2d [1294,] 1295 [(Pa. 1995)] (noting that "the ultimate discretion to file criminal charges lies in the district attorney").

*Commonwealth v. Cosby*, 252 A.3d 1092, 1134 (Pa. 2021).

Importantly, the DA does not cite any constitutional provision which he claims Act 40 violates in his argument that Act 40 nullifies his core prosecutorial functions. "[I]t is incumbent upon one raising the specter that a statute is unconstitutional to state, at least in somewhat express terms, the specific constitutional grounds upon which the challenger is basing its attack on the legislation." *In re F.C. III*, 2 A.3d 1201, 1212 (Pa. 2010); *see also HIKO Energy, LLC v. Pa. Pa. Pub. Util. Comm'n*, 209 A.3d 246, 263 (Pa. 2019).

Section 205(a) of the CAA, 71 P.S. § 732-205(a), provides the Attorney General with the authority to prosecute certain cases in county criminal court.[23] Section

---

[23] Those cases include:

(1) Criminal charges against [s]tate officials or employees affecting the performance of their public duties or the maintenance of the public trust and criminal charges against persons attempting to influence such State officials or employees or benefit from such influence or attempt to influence.

(2) Criminal charges involving corrupt organizations as provided for in [Section 911 of the Crimes Code,] 18 Pa.C.S. § 911 (relating to corrupt organizations).

(3) Upon the request of a district attorney who lacks the resources to conduct an adequate investigation or the prosecution of the criminal case or matter or who represents that there is the potential for an actual

205(b) of the CAA also provides that the "[t]he Attorney General shall have the concurrent prosecutorial jurisdiction with the district attorney" in specific situations. 71 P.S. § 732-205(b). Thus, the Attorney General may intercede under specific enumerated circumstances provided in the CAA.

Act 40 nevertheless empowers the special prosecutor with authority "**[n]otwithstanding any other provision of law or regulation**[.]" 74 Pa.C.S. § 1786(a)(2) (emphasis added). The Pennsylvania Supreme Court ruled that "it is well

---

or apparent conflict of interest on the part of the district attorney or his office.

(4) The Attorney General may petition the court having jurisdiction over any criminal proceeding to permit the Attorney General to supersede the district attorney in order to prosecute a criminal action or to institute criminal proceedings. . . . Supersession shall be ordered if the Attorney General establishes by a preponderance of the evidence that the district attorney has failed or refused to prosecute and such failure or refusal constitutes abuse of discretion.

(5) When the president judge in the district having jurisdiction of any criminal proceeding has reason to believe that the case is a proper one for the intervention of the Commonwealth, he shall request the Attorney General to represent the Commonwealth in the proceeding and to investigate charges and prosecute the defendant. If the Attorney General agrees that the case is a proper one for intervention, he shall file a petition with the court and proceed as provided in paragraph (4). If the Attorney General determines that the case is not a proper case for intervention, he shall notify the president judge accordingly.

(6) Criminal charges investigated by and referred to him by a Commonwealth agency arising out of enforcement provisions of the statute charging the agency with a duty to enforce its provision.

(7) Indictments returned by an investigating grand jury obtained by the Attorney General.

(8) Criminal charges arising out of activities of the State Medicaid Fraud Control Unit as authorized by Article XIV (relating to fraud and abuse control), [A]ct of June 13, 1967 (P.L. 31, No. 21), known as the "Public Welfare Code," and the [f]ederal law known as the "Medicare-Medicaid Antifraud and Abuse Amendments[,]" [*see* 42 U.S.C. § 1305 note].

71 P.S. § 732-205(a).

30

established that **since the [Pennsylvania] Constitution does not prescribe the duties of the district attorney**[,] **the legislature may regulate the performance of such duties** and provide for cases in which it would be improper for the elected officer to act." *Shelley*, 2 A.2d at 812 (emphasis added); *see also McHale*, 97 Pa. at 406 ("[The General Assembly] can regulate the performance of [the district attorney's] duties . . . .").[24] The General Assembly, in Act 40, clearly empowered the special prosecutor, "notwithstanding any other provision of law[,]" including the CAA. 74 Pa.C.S. § 1786(a)(2).[25] "[N]o home rule charter may confer upon a home[ ]rule municipality 'power or authority' that is 'contrary to or in limitation or enlargement of powers granted by statutes which are applicable to a class or classes of municipalities.' 53 Pa.C.S. § 2962(a)." *Pa. Rest. & Lodging Ass'n*, 211 A.3d at 817. Therefore, the

---

[24] Although *Shelley* and *McHale* predate the current 1968 Pennsylvania Constitution, like its predecessor, the current Pennsylvania Constitution similarly does not "prescribe the duties of the District Attorney." *Shelley*, 2 A.2d at 812.

[25] Further, to the extent the DA argues that the special prosecutor's powers under Act 40 conflict with the Attorney General's limited authority under the CAA, this Court has observed:

> [S]ection 1933 of the Statutory Construction Act [of 1972] provides that:
>
>> Whenever a general provision in a statute shall be in conflict with a special provision in the same or another statute, the two shall be construed, if possible, so that effect may be given to both. If the conflict between the two provisions is irreconcilable, the special provisions shall prevail and shall be construed as an exception to the general provision, unless the general provision shall be enacted later and it shall be the manifest intention of the General Assembly that such general provision shall prevail.
>
> 1 Pa.C.S. § 1933.

*Alpha Fin. Mortg., Inc. v. Redevelopment Auth. of Fayette Cnty.*, 152 A.3d 375, 381-82 (Pa. Cmwlth. 2016). "Whenever the provisions of two or more statutes enacted finally by different General Assemblies are irreconcilable, the statute latest in date of final enactment shall prevail." 1 Pa.C.S. § 1936.

General Assembly is free to determine district attorney duties not prescribed by the Pennsylvania Constitution. *See Shelley*; *see also McHale*. The DA's claim must fail because he did not cite a specific constitutional provision to support his constitutional challenge.

### 4. DA Application Claim III -<br>Act 40 is a Local or Special Law

The DA next contends that Act 40 is a prohibited local or special law, specifically targeting the City of Philadelphia, the DA, and his office. However, Act 40 does not target the City of Philadelphia, the DA, and the DA's Office; rather, it is directed at SEPTA and crimes occurring therein. Article III, section 32 of the Pennsylvania Constitution provides, in relevant part:

> **The General Assembly shall pass no local or special law** in any case which has been or can be provided for by general law and specifically the General Assembly shall not pass any local or special law:
>
> 1. Regulating the affairs of counties, cities, townships, wards, boroughs[,] or school districts[.]

PA. CONST. art. III, § 32 (emphasis added).

Importantly, Act 40 is not regulating the affairs of Philadelphia, it is clearly directed at SEPTA. Act 40 protects SEPTA's employees and the Commonwealth's citizenry to whom SEPTA "provid[es] public transportation in and around the Commonwealth's largest metropolitan area." *Davis*, 980 A.2d at 713. The Commonwealth controls and operates SEPTA. SEPTA's enabling statute provides: "An authority shall in no way be deemed to be an instrumentality of any city or county or other municipality or engaged in the performance of a municipal function, but shall exercise the public powers of the Commonwealth as an agency and instrumentality thereof." 74 Pa.C.S. §§ 1711(a). Accordingly, Act 40 is not a local or special law.

Notwithstanding, even if Act 40 regulated the affairs of Philadelphia or the DA's duties, it would be constitutional. Article IX, section 13(b) of the Pennsylvania Constitution states: "**Local and special laws**, regulating the affairs of the City of Philadelphia and creating offices or **prescribing the powers and duties of officers of the City of Philadelphia**, **shall be valid** notwithstanding the provisions of section thirty-two of [a]rticle III of this Constitution." PA. CONST. art. IX, § 13(b) (emphasis added).

Thus,

> [s]pecial treatment of the [C]ity of Philadelphia by legislation, as well as by these constitutional provisions, is authorized by the constitution, which declares that local and special laws regulating Philadelphia are valid despite the general state constitution provision forbidding such legislation with respect to cities as well as other local units.

23 Summ. Pa. Jur. 2d Municipal and Local Law § 21:27 (2d ed. 2024).

The DA argues that the provisions of article IX, section 13(b) of the Pennsylvania Constitution do not apply to the instant situation because Act 40 does not "create offices or prescrib[e] the powers and duties of officers of the City of Philadelphia[.]" PA. CONST. art. IX, § 13(b). Instead, the DA contends that Act 40 prescribes the special prosecutor's powers. Merriam-Webster defines "prescribe" as "to lay down a rule[.]"[26] https://www.merriam-webster.com/dictionary/prescribe (last visited June 14, 2024).

Although Act 40 *primarily* prescribes the special prosecutor's powers, it does address and prescribe the DA's duties.[27] The Pennsylvania Supreme Court has

---

[26] "It is accepted that dictionaries are a source of the common meaning." *Allegheny*, 309 A.3d at 925 n.148.

[27] The Dissent essentially ignores this fact by claiming, without any citations to support its position, that "[e]xisting statutes and the Constitution 'prescrib[e] the duties and powers' of the [DA]. Act 40 barely modifies them." DO, slip op. at 17. To the contrary, **it is Act 40's alleged significant**

observed: "[D]istrict attorneys in this Commonwealth have the power - and the **duty** - to represent the Commonwealth's interests in the enforcement of its *criminal laws*." *Bauer*, 261 A.2d at 575 (bold emphasis added). In Act 40, the General Assembly *laid down a rule* empowering the special prosecutor to enforce the criminal laws within SEPTA, and precluding the DA from acting in cases where the special prosecutor acts. Further, Act 40, *inter alia*, mandates:

> When a special prosecutor asserts preemptive prosecutorial jurisdiction under this subparagraph, **the office of the district attorney** in a county of the first class **shall suspend all investigations and proceedings** regarding the matter **and shall turn over to the special prosecutor all materials**, files **and other data relating to the matter**.

74 Pa.C.S. § 1786 (emphasis added). Accordingly, Act 40 prescribes both the special prosecutor's and the DA's duties. Because Act 40 prescribes the DA's duties, article IX, section 13(b) of the Pennsylvania Constitution applies, and exempts Act 40 from the prohibitions on special legislation.[28]

---

**modification of the DA's duties that underlies the DA's objection to it**. These purported modifications include prescribing the DA's duties by requiring the DA to cooperate with a special prosecutor invested with jurisdiction over crimes occurring within SEPTA.

[28] The DA also argues that Act 40 violates article III, section 7 of the Pennsylvania Constitution, which states:

> No local or special bill shall be passed unless notice of the intention to apply therefor shall have been published in the locality where the matter or the thing to be effected may be situated, which notice shall be at least thirty days prior to the introduction into the General Assembly of such bill and in the manner to be provided by law; the evidence of such notice having been published, shall be exhibited in the General Assembly, before such act shall be passed.

PA. CONST. art. III, § 7.

This Court's February 2, 2024 Order reflects that the parties agreed that the instant matter concerns "only legal issues and that hearings thereon are not necessary . . . ." Feb 2, 2024 Order at 1. Whether the General Assembly issued the required notice is a factual determination that should have been raised prior to the parties' agreement. Because the parties have agreed that there are no disputed facts, the issue is not properly before this Court. Moreover, the DA did not raise this issue

## 5. DA Application Claim IV -
## Act 40 Violates Equal Protection Guarantees

The DA next maintains that Act 40 violates equal protection principles because it gives the special prosecutor greater power over the DA than over other county district attorneys.

The Pennsylvania Supreme Court has explained:

> In Pennsylvania, constitutional equal protection is grounded in [article III, section 32 of the Pennsylvania Constitution (Special Legislation),] PA. CONST. [a]rt. III, § 32. We have repeatedly held that the underlying purpose of this section is analogous to the equal protection clause of the federal constitution and that our analysis and interpretation of the clause should be guided by the same principles that apply in interpretation of federal equal protection.

*DeFazio v. Civ. Serv. Comm'n of Allegheny Cnty*., 756 A.2d 1103, 1105 (Pa. 2000); *see also Sheppleman v. City of Chester Aggregated Pension Fund*, 271 A.3d 938, 957 (Pa. Cmwlth. 2021) ("Equal protection under both constitutions are analyzed under the same standards."). However, as discussed above, Philadelphia is exempted from the ban on special legislation.[29] *See* PA. CONST. art. IX, § 13(b).

Article III, section 20 of the Pennsylvania Constitution provides:

> The [l]egislature shall have power to classify counties [and] cities . . . according to population, and all laws passed relating to each class, and all laws passed relating to, and regulating procedure and proceedings in court with reference to[] any

---

in his Petition for Review, or in the DA Application but, rather, raised it for the first time in the Memorandum of Law in Support of the DA Application.

[29] Notwithstanding, the Dissent maintains that "this case is squarely on point with *DeFazio*[.]" DO, slip op. at 18. The Dissent supports this claim by merging the DA's special legislation arguments with the DA's equal protections arguments, as well as by looking outside the constitutional provisions' text. "[W]hen interpreting constitutional provisions, a court may not disregard the plain language of [the provision] in favor of 'a supposed intent.' *League of Women Voters* [*v. Commonwealth*], 178 A.3d [737,] 802 [(Pa. 2018)]. Nor can a court impose a restraint on legislative authority that is not contained in the Constitution." *McLinko*, 279 A.3d at 578-79. Article IX, section 13(b) of the Pennsylvania Constitution is clear on its face, as is article III, section 20 of the Pennsylvania Constitution discussed below. Accordingly, *DeFazio* is inapposite.

class[] shall be deemed general legislation within the meaning of this Constitution.

PA. CONST. art. III, § 20. Thus, a general law is uniform throughout the Commonwealth **or uniform in its application among cities or counties of the <u>same</u> class**, while a special law is not.

> Our Supreme Court in *Appeal of Torbik*[,] . . . 696 A.2d 1141, 1146 ([Pa.] 1997), quoting from *Heuchert v. State Harness Racing Commission*, . . . 170 A.2d 332, 336 ([Pa.] 1961), explained what constituted a special law:
>
>> [A] special law is the opposite of a general law. A special law is not uniform throughout the state or applied to a class. A general law is. It is well known that the [l]egislature has classified cities and counties. A law dealing with all cities or all counties of the same class is not a special law, but a general law, uniform in its application. But a law dealing with but one county of a class consisting of ten, would be local or special.

*Harrisburg Sch. Dist. v. Hickok*, 781 A.2d 221, 227 n.7 (Pa. Cmwlth. 2001).

Importantly, the Pennsylvania Supreme Court has declared that "[l]egislation for a class is not an impermissible special law where the legislative classification 'is founded on real distinctions in the subjects classified, and not on artificial or irrelevant ones.'" *Leventhal v. City of Phila.*, 542 A.2d 1328, 1332 (Pa. 1988) (quoting *Freezer Storage, Inc. v. Armstrong Cork Co.*, 382 A.2d 715, 718 (Pa. 1978)). Here, Act 40 applies uniformly to first class counties, albeit that Pennsylvania has only one first class county, and addresses a first class countywide concern - increased criminal activity in the first class county on the countywide transportation system. As a general law, "a statute may negate a home rule charter when the conflict involves a matter of statewide magnitude, such as the regulation of firearms." *In re Appointment of Dist. Att'y*, 756 A.2d 711, 714 (Pa. Cmwlth. 2000). Concerns of criminal activity on SEPTA property both inside and outside of Philadelphia, and its

impact on the safety of citizenry and visitors, law enforcement, and the statewide economy are matters of statewide magnitude.[30]

Notably,

[e]qual protection principles do not, however, vitiate the [l]egislature's power to classify, which necessarily flows from its general power to enact regulations for the health, safety, and welfare of the community. Nor do they prohibit differential treatment of persons having different needs, . . . provided the classifications at issue bear a reasonable relationship to a legitimate state purpose. **In this regard**, **a classification**, **though discriminatory**, **will be deemed reasonable if any state of facts reasonably can be conceived to sustain it**. However, a classification will be struck down if it is based upon artificial or irrelevant distinctions used for the purpose of evading the constitutional prohibition. In undertaking its analysis, a reviewing court is free to hypothesize reasons the [l]egislature might have had for the classification.

*Harrisburg Sch. Dist. v. Zogby*, 828 A.2d 1079, 1088-89 (Pa. 2003) (emphasis added; citations and footnote omitted).

Moreover, this Court has held:

Where the plaintiff does not allege membership in a protected class, he may assert an equal protection claim under the "class of one" theory. *Vill*[.] *of Willowbrook v. Olech*, 528 U.S. 562, 564 . . . (2000). A plaintiff bringing a "class of one" claim must demonstrate that[:] (1) the defendant treated him differently from others similarly situated; (2) the defendant did so intentionally; and (3) any differential treatment was without rational basis. *Hill v. Borough of Kutztown*, 455 F.3d 225, 239 (3d Cir. 2006). A "class of one" claim, like any equal protection claim evaluated under rational basis review, cannot succeed "if there is any reasonably conceivable state of facts that could provide a

---

[30] *See Schab*, 383 A.2d at 830 ("[A] district attorney's duty to enforce the laws of the Commonwealth [is] a duty in which all of Pennsylvania's citizens, no matter where they live, have an interest.").

rational basis for the classification." *Heller v. Doe*, 509 U.S. 312, 320 . . . (1993) (quotation omitted).

*Cornell Narberth, LLC v. Borough of Narberth*, 167 A.3d 228, 243 (Pa. Cmwlth. 2017).

Unlike in *DeFazio*, cited by the DA, which involved a second class city, the law at issue here pertains to Philadelphia, which is exempted from the ban on special legislation. Further, unlike the law at issue in *DeFazio*, Act 40 does not treat the DA differently than other district attorneys merely because he is the Philadelphia District Attorney. Act 40 creates a special prosecutor because the General Assembly determined that DA Krasner permitted crime to metastasize within SEPTA, causing a threat to public safety.[31] Act 40, which the General Assembly enacted and Governor Shapiro signed into law, is the curative response to protect SEPTA's employees and patrons. Thus, Act 40 bears a reasonable relationship to a legitimate state interest which constitutes a rational basis for the classification. Accordingly, Act 40 does not clearly, palpably, and plainly violate the Pennsylvania Constitution's equal protection guarantees.

### 6. DA Application Claim V -
### Special Prosecutor Lack of Accountability

The DA next argues that "[t]he [s]pecial [p]rosecutor is not accountable to the citizens of Philadelphia or any other county. By its terms, Act 40 does not even make the [s]pecial [p]rosecutor accountable to the Attorney General or anyone else. This is an unaccountable, lone ranger [s]pecial [p]rosecutor . . . ."[32] DA Br. at 46.

---

[31] *See* Select Committee on Restoring Law and Order, Second Interim Report, (October 24, 2022), https://www.pahousegop.com/Display/SiteFiles/1/2022/Select%20Committee%20on%20Restoring %20Law%20and%20Order%202ndInterim%20Report%20102422.pdf (last visited June 14, 2024).

[32] The DA also claims "Act 40's [s]pecial [p]rosecutor does not even have to take an oath to uphold the Constitution." DA Br. at 47. Despite that Act 40 does not state whether the special prosecutor will be subject to an oath, article VI, section 3 of the Pennsylvania Constitution states:

38

The DA does not cite to a specific constitutional provision to support his claim that Act 40 is unconstitutional on the grounds that it calls for the appointment of an unaccountable special prosecutor. Nor does the DA cite any authority that special prosecutors appointed by the Attorney General must be elected. In addition, article VI, section 1 of the Pennsylvania Constitution provides: "All officers, whose selection is not provided for in this Constitution, shall be elected or appointed as may be directed by law." PA. CONST. art. VI, § 1. Act 40 directs the Attorney General to appoint the special prosecutor.

Despite that Act 40 does not declare to whom the special prosecutor is accountable, article VI, section 7 of the Pennsylvania Constitution specifies, in relevant part:

> All civil officers shall hold their offices on the condition that they behave themselves well while in office, and shall be removed on conviction of misbehavior in office or of any infamous crime. Appointed civil officers . . . **may be removed at the pleasure of the power by which they shall have been appointed**.

---

Senators, Representatives and all judicial, [**s**]**tate** and **county officers shall**, before entering on the duties of their respective offices, take and subscribe the following oath or affirmation before a person authorized to administer oaths.

> "I do solemnly swear (or affirm) that I will support, obey and defend the Constitution of the United States and the Constitution of this Commonwealth and that I will discharge the duties of my office with fidelity."

The oath or affirmation shall be administered to a member of the Senate or to a member of the House of Representatives in the hall of the House to which he shall have been elected.

Any person refusing to take the oath or affirmation shall forfeit his office.

PA. CONST. art. VI, § 3 (emphasis added).

PA. CONST. art. VI, § 7 (emphasis added). The Attorney General's Act 40 appointment power is the "power by which [the special prosecutor has] been appointed." *Id*. Thus, the Attorney General, pursuant to article VI, section 7 of the Pennsylvania Constitution, may remove the special prosecutor. In addition, Act 40 reflects: "If a vacancy in office arises by reason of the resignation, death[,] or removal for any other reason of a special prosecutor, the Attorney General shall appoint a replacement within 30 days." 74 Pa.C.S. § 1786(a)(6). Thus, the special prosecutor is appointed by statute and is accountable to and may be removed by the Attorney General. The DA's claim must fail because he did not cite a specific constitutional provision to support his constitutional challenge.

### 7. DA Application Claim VI – Act 40 Violates CHRIA

The DA additionally asserts that Act 40 is unenforceable because it violates CHRIA by requiring the DA to disseminate information to the special prosecutor not based upon a name, fingerprints, modus operandi, genetic typing, voice print, or other identifying characteristic. *See* Pet. for Rev. ¶¶ 156-162.

> Act 40 declares, in pertinent part:

> A special prosecutor may assert preemptive prosecutorial jurisdiction over any criminal actions or proceedings involving alleged violations of the laws of this Commonwealth occurring within [SEPTA] in [Philadelphia County]. The following shall apply:

> . . . .

> (iv) When a special prosecutor asserts preemptive prosecutorial jurisdiction under this subparagraph, the [**DA**] shall suspend all investigations and proceedings regarding the matter and **shall turn over to the special prosecutor all materials**, **files**[,] **and other data relating to the matter**.

74 Pa.C.S. § 1786(a)(4) (emphasis added).

CHRIA "appl[ies] to persons within this Commonwealth and to any agency of the Commonwealth or its political subdivisions which collects, maintains, disseminates[,] or receives criminal history record information." 18 Pa.C.S. § 9103. "As a matter of law, CHRIA prohibits disseminating 'investigative information' to any persons or entities other than criminal justice agents and agencies. 18 Pa.C.S. § 9106(c)(4)." *Cal. Borough v. Rothey*, 185 A.3d 456, 467 (Pa. Cmwlth. 2018). Section 9102 of CHRIA defines *investigative information* as "[i]nformation assembled as a result of the performance of any inquiry, formal or informal, into a criminal incident or an allegation of criminal wrongdoing[,] and may include modus operandi information." 18 Pa.C.S. § 9102.

> Specifically, Section 9106(c)(4) of CHRIA states:

> **Investigative** . . . **information shall not be disseminated** to any department, agency[,] or individual **unless the department**, **agency**[,] **or individual requesting the information is a criminal justice agency** which requests the information in connection with its duties, **and the request is based upon a name**, **fingerprints**, **modus operandi**, **genetic typing**, **voice print**[,] **or other identifying characteristic**.

18 Pa.C.S. § 9106(c)(4) (bold and underline emphasis added).

> CHRIA defines *criminal justice agency* as

> Any court, including the minor judiciary, with criminal jurisdiction or **any other governmental agency, or subunit thereof, created by statute or by the [s]tate or [f]ederal constitutions**, **specifically authorized to perform as its principal function the administration of criminal justice**, and which allocates a substantial portion of its annual budget to such function. Criminal justice agencies include, but are not limited to: . . . **district or prosecuting attorneys**, . . . and **such agencies or subunits thereof**[] as are declared by the Attorney General to be criminal justice agencies . . . .

18 Pa.C.S. § 9102 (emphasis added).

CHRIA further defines *administration of criminal justice* as "[t]he activities directly concerned with the prevention, control or reduction of crime, the apprehension, detention, pretrial release, post-trial release, **prosecution**, adjudication, correctional supervision or rehabilitation **of accused persons or criminal offenders**; criminal identification activities; or the collection, storage dissemination or usage of criminal history record information." *Id.* (emphasis added). As the special prosecutor is created by statute (and appointed by the Attorney General[33]), and specifically authorized to perform the function of prosecuting accused persons or criminal offenders, the special prosecutor is by definition a subunit of a criminal justice agency. Thus, the DA would not violate CHRIA by disseminating investigative information to the special prosecutor.

However, Section 9106(c)(4) of CHRIA limits the information the DA may disseminate to another criminal justice agency to "name, fingerprints, modus operandi, genetic typing, voice print[,] or other identifying characteristic[,]" 18 Pa.C.S. § 9106(c)(4), while Act 40 requires the DA to provide "all materials, files[,] and other data relating to" investigations and proceedings within SEPTA. 74 Pa.C.S. § 1786(a)(4)(iv). While SEPTA asserts that these statutory provisions are not in conflict and can be read *in pari materia*, Act 40 clearly specifies that "[n]otwithstanding any other provision of law or regulation, . . . [t]he special prosecutor's . . . [i]nvestigative

---

[33] Moreover, under Section 9161 of CHRIA, the Attorney General

> shall have the power and authority to: (1) [e]stablish rules and regulations for criminal history record information with respect to security, completeness, accuracy, individual access and review, quality control and audits of repositories. . . . [and] (5) [c]onduct annual audits of the central repository and of a representative sample of all repositories within the Commonwealth, collecting, compiling, maintaining[,] and disseminating criminal history record information.

18 Pa.C.S. § 9161.

and prosecutorial functions and powers shall include . . . [r]eviewing all documentary evidence available from any source." 74 Pa.C.S. § 1786(a)(2)(i)(D).

> [S]ection 1933 of the Statutory Construction Act [of 1972] provides that:
>
>> Whenever a general provision in a statute shall be in conflict with a special provision in the same or another statute, the two shall be construed, if possible, so that effect may be given to both. If the conflict between the two provisions is irreconcilable, the special provisions shall prevail and shall be construed as an exception to the general provision, unless the general provision shall be enacted later and it shall be the manifest intention of the General Assembly that such general provision shall prevail.
>
> 1 Pa.C.S. § 1933.

*Alpha Fin. Mortg., Inc. v. Redevelopment Auth. of Fayette Cnty.*, 152 A.3d 375, 381-82 (Pa. Cmwlth. 2016). "Whenever the provisions of two or more statutes enacted finally by different General Assemblies are irreconcilable, the statute latest in date of final enactment shall prevail." 1 Pa.C.S. § 1936. Because Act 40 is later in time and more specific, this Court must presume that the General Assembly intended that Act 40 prevail over the conflicting CHRIA provisions to permit the special prosecutor to obtain "**all** documentary evidence available from **any** source." 74 Pa.C.S. § 1786(a)(2)(i)(D) (emphasis added). Accordingly, Act 40 is not unenforceable because it violates CHRIA.

### 8. DA Application Claim VII -
### Act 40 Impairs the Effective Prosecution of Criminal Defendants

Finally, the DA asserts that Act 40's prohibition on criminal defendants challenging the special prosecutor's authority is an unconstitutional violation of their

rights to raise arguments in their defense and will thus impair the effective prosecution of such defendants. *See* Pet. for Rev. ¶¶ 163-168.

> Specifically, Act 40 declares:

> No person charged with a violation of the law by a special prosecutor shall have standing to challenge the authority of the special prosecutor to prosecute the case. If a challenge is made, the challenge shall be dismissed[,] and no relief shall be available in the courts of this Commonwealth to the individual making the challenge.

74 Pa.C.S. § 1786(a)(5).

> The DA claims in the Petition for Review:

> 165. Act 40 is [] unconstitutional in violating criminal defendants' right[s] to raise arguments in their defense. *See*, e.g., *Holt v. Commonwealth of V[a.]*, 381 U.S. 131, 136 (1965) ("The right to be heard must necessarily embody a right to file motions and pleadings essential to present claims and raise relevant issues.").

> 166. As a consequence, prosecutions by an Act 40 [s]pecial [p]rosecutor would vastly complicate prosecutions of crimes within SEPTA in Philadelphia and likely lead to the dismissal of charges or convictions for crimes committed within SEPTA in Philadelphia.

Pet. for Rev. ¶¶ 165-166.

> In his brief, the DA adds that Act 40 violates article I, section 9 of the Pennsylvania Constitution, which states:

> In all criminal prosecutions the accused hath a right to be heard by himself and his counsel, to demand the nature and cause of the accusation against him, to be confronted with the witnesses against him, to have compulsory process for obtaining witnesses in his favor, and, in prosecutions by indictment or information, a speedy public trial by an impartial jury of the vicinage; he cannot be compelled to give evidence against himself, nor can he be deprived of his life, liberty or property, unless by the judgment of his peers or the law of the land. The use of a suppressed voluntary admission

44

or voluntary confession to impeach the credibility of a person may be permitted and shall not be construed as compelling a person to give evidence against himself.

PA. CONST. art. I, § 9.

As explained, *supra*, the DA has no standing to raise arguments for criminal defendants.[34] In addition, the DA's argument that Act 40's statutory scheme

---

[34] The Concurrence/Dissent also concludes that the DA has standing to assert criminal defendants' due process rights to challenge Act 40. Importantly, Act 40 does not deprive a criminal defendant of any right to defend against the legal arguments and evidence establishing the elements of the crime. Nonetheless, relying on Pennsylvania Rule of Professional Conduct (RPC) 3.8, the Concurrence/Dissent maintains that the DA has an ethical obligation to ensure that defendants are afforded their rights. However, nowhere in RPC 3.8 does it state that prosecutors are in fact responsible for asserting a criminal defendant's rights. Moreover, RPC 3.8, by its express terms, applies to "[t]**he prosecutor in a criminal case**[.]" Pa.R.P.C. 3.8 (emphasis added). RPC 3.8 provides:

> The prosecutor in a criminal case shall:
>
> **(a)** refrain from prosecuting a charge that the prosecutor knows is not supported by probable cause;
>
> **(b)** make reasonable efforts to assure that the accused has been advised of the right to, and the procedure for, obtaining counsel and has been given reasonable opportunity to obtain counsel;
>
> **(c)** not seek to obtain from an unrepresented accused a waiver of important pretrial rights, such as the right to a preliminary hearing;
>
> **(d)** make timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense, and, in connection with sentencing, disclose to the defense and to the tribunal all unprivileged mitigating information known to the prosecutor, except when the prosecutor is relieved of this responsibility by a protective order of the tribunal; and
>
> **(e)** except for statements that are necessary to inform the public of the nature and extent of the prosecutor's action and that serve a legitimate law enforcement purpose, refrain from making extrajudicial comments that have a substantial likelihood of heightening public condemnation of the accused and exercise reasonable care to prevent investigators, law enforcement personnel, employees or other persons assisting or associated with the prosecutor in a criminal case from making an

will "likely lead to the dismissal of charges or convictions" is entirely speculative. Pet. for Rev. ¶ 166. "[A] constitutional challenge cannot be sustained on the basis of supposition and speculation as to future events." *Ramey Borough v. Commonwealth, Dep't of Env't Res.*, 327 A.2d 647, 650 (Pa. Cmwlth. 1974), *aff'd*, 351 A.2d 613 (Pa. 1976); *see also Hoolick v. Retreat State Hosp.*, 354 A.2d 609 (Pa. Cmwlth. 1976). Accordingly, the DA's constitutional challenge relating to criminal defendants fails.

---

extrajudicial statement that the prosecutor would be prohibited from making under [RPC] 3.6 or this Rule.

Pa.R.P.C. 3.8. **Nothing in RPC 3.8 or its Explanatory Comment states or in any way implies that a district attorney has an affirmative duty to proactively protect the rights of potential future defendants - unindicted persons - from prosecution in a possible criminal action by a prosecutor appointed by the General Assembly**.

Further, to assert standing, a "putative plaintiff [must] demonstrate[] that []he is 'aggrieved,' by establishing a **substantial**, **direct and immediate interest** in the outcome of the litigation." *Allegheny*, 309 A.3d at 832 (emphasis added). To the extent that some duty under RPC 3.8 exists with respect to defendants charged "*in a criminal case*[,]" Pa.R.P.C. 3.8 (emphasis added), and the DA is aggrieved thereby, and, thus, has standing to assert criminal defendants' due process rights in cases in which the DA has jurisdiction, there is no such aggrievement and corresponding standing in cases in which the DA will lack jurisdiction, such as those the special prosecutor chooses to prosecute.

This Court has explained:

> Because the elements of standing "are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation."

*Muth v. Dep't of Env't Prot.*, ___ A.3d ___, ___ (Pa. Cmwlth. No. 1346 C.D. 2922, filed April 16, 2024) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)). Here, the Concurrence/Dissent seeks to impose a duty based solely on Pennsylvania's Rules of Professional Conduct for the purpose of finding that the DA is **aggrieved by a possible future prosecution of an undetermined criminal defendant in which the DA will not be involved**, but does not explain how the DA's interest is "substantial, direct[,] and immediate." *Allegheny*, 309 A.3d at 808. There is no such interest. Accordingly, because the DA is not aggrieved, he lacks standing to assert future criminal defendants' due process rights to challenge Act 40.

## C. Preliminary Injunctions

In his PI Petition, the DA seeks a preliminary injunction enjoining the Attorney General from implementing Act 40. Given this Court's disposition of the above arguments, the DA's PI Petition and Supplemental PI are moot.

## III. Conclusion

For all of the above reasons, this Court grants the Intervention Petition and grants in part and denies in part SEPTA's Application consistent with this Opinion. Further, this Court holds that Act 40 does not clearly, palpably, and plainly violate the Pennsylvania Constitution and therefore denies the DA Application and grants the Attorney General Application. In addition, this Court denies the PI Petition and Supplemental PI as moot.[35]

_____
ANNE E. COVEY, Judge

Judge Wallace did not participate in the decision in this matter.

---

[35] Given this Court's disposition of the Cross-Applications, it does not reach the remaining issues in the SEPTA Application.

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Larry Krasner, in his official capacity : 
as the District Attorney of Philadelphia; :
Office of the District Attorney, City of :
Philadelphia, :
                 Petitioners :
                  :
           v. :
                  :
Michelle A. Henry, in her :
official capacity as Attorney :
General of Pennsylvania, :   No. 8 M.D. 2024
             Respondent :

## O R D E R

AND NOW, this 14th day of June, 2024, this Court: (1) GRANTS the Southeastern Pennsylvania Transportation Authority's (SEPTA) petition to intervene; (2) GRANTS IN PART and DENIES IN PART SEPTA's Application for Summary Relief consistent with this Opinion; (3) DENIES the Application for Summary Relief filed by Larry Krasner, in his official capacity as the District Attorney of Philadelphia, and the Office of the District Attorney, City of Philadelphia (collectively, DA); (4) GRANTS the Application for Summary Relief filed by Michelle A. Henry, in her official capacity as Attorney General of Pennsylvania; and (5) DENIES the DA's Petition for Preliminary Injunction and Emergency Supplemental Application for Preliminary Injunction as moot.

_____
ANNE E. COVEY, Judge

Larry Krasner, in his official :
capacity as the District Attorney :
of Philadelphia; Office of the :
District Attorney, City of :
Philadelphia, :
                           Petitioners :
                                        :
        v.                              :
                                        :
Michelle A. Henry, in her :
official capacity as Attorney :
General of Pennsylvania, :          No. 8 M.D. 2024
                           Respondent :   Argued: April 10, 2024

BEFORE:     HONORABLE RENÉE COHN JUBELIRER, President Judge
            HONORABLE PATRICIA A. McCULLOUGH, Judge
            HONORABLE ANNE E. COVEY, Judge
            HONORABLE CHRISTINE FIZZANO CANNON, Judge
            HONORABLE ELLEN CEISLER, Judge
            HONORABLE LORI A. DUMAS, Judge
            HONORABLE MATTHEW S. WOLF, Judge

CONCURRING AND DISSENTING OPINION
BY JUDGE FIZZANO CANNON                     FILED: June 14, 2024


        I concur with the majority opinion, in part, but respectfully dissent to
the extent that the majority rejects entirely the constitutional challenges asserted by
the current District Attorney of Philadelphia (DA) to the Act of December 14, 2023,
P.L. 369, No. 40, 74 Pa.C.S. § 1786 (Act 40).  This dissenting opinion takes no
position on the policies or conduct of the DA or the General Assembly's interest in
enacting legislation that impacts the DA's office.  Rather, I conclude that Act 40
improperly delegates the General Assembly's legislative authority, and I would
grant summary relief for the DA on that basis.  I further conclude that Act 40's
deprivation of a criminal defendant's ability to challenge the jurisdiction of the
Special Prosecutor violates due process.

**Improper Delegation of Legislative Authority**

The DA challenges, as impermissibly vague, Act 40's provision conferring on the Special Prosecutor jurisdiction over crimes occurring "within a public transportation authority . . . " in a county of the first class, *i.e.*, "within" the Southeastern Pennsylvania Transportation Authority (SEPTA). 74 Pa.C.S. § 1786(a)(2). The DA has not raised a constitutional void-for-vagueness claim as such; indeed, this Court has explained that "the void-for-vagueness doctrine applies only to penal statutes." *Melton v. Beard*, 981 A.2d 361, 364 (Pa. Cmwlth. 2009); *see also Hill v. Pa. Dep't of Corr.* (Pa. Cmwlth., No. 405 M.D. 2014, filed July 13, 2015), slip op. at 8, *aff'd per curiam*, 131 A.3d 986 (Pa. 2016)[1] (citing *Melton*).  However, improper vagueness of the word "within," as used in Act 40, is asserted and preserved as an issue in the context of challenging the Special Prosecutor's unfettered discretion.

The DA aptly describes the vagueness difficulty with Act 40 as follows:

> Act 40 sets aside broad territorial jurisdiction for the appointed Special Prosecutor, who will "investigate and institute criminal proceedings for a violation of the laws of this Commonwealth occurring *within* a public transportation authority." [74 Pa.C.S.] § 1786(a) & (a)(2) (emphasis added).  Although Act 40 repeatedly uses the phrase "occurring within a public transportation authority," it does not define that phrase. *See, e.g.*, [74 Pa.C.S.] § 1786(a) & (a)(2).  The law's vagueness on this central question – the breadth of the Special Prosecutor's territorial jurisdiction – is one of many things that dooms the law.  For example, does the Special Prosecutor's authority extend only to SEPTA headquarters, stations, trains and buses?  What about at SEPTA's bus stops, bus routes, train tracks and countless rights[-]of[-]way[] throughout Philadelphia and the region?

Pet. for Rev., Ex. 5 at 7 (emphasis added).  Indeed, the majority opinion, while providing a lengthy history of the creation and purpose of SEPTA, provides no

---

[1] This unpublished case is cited for its persuasive value pursuant to Section 414(a) of this Court's Internal Operating Procedures.  210 Pa. Code § 69.414(a).

explanation of what "within" SEPTA means. The DA argues that the scope of the power conferred on the Special Prosecutor in Act 40 impermissibly gives the Special Prosecutor complete discretion to determine the meaning of "within a public transit authority," *i.e.*, "within" SEPTA. That argument is fairly and properly understood as challenging the General Assembly's impermissible delegation of its legislative authority.[2]

"[A] statute must prescribe 'with reasonable clarity the limits of power delegated . . .'"; where it fails to do so, it is open to challenge for vagueness as "an

---

[2] I disagree with the majority's characterization of this point as raising an argument for a party *sua sponte*. There are no magic words required to assert a constitutional non-delegation argument. As the Superior Court has observed,

> while constitutional and statutory-based claims can be waived, courts are not required to view only the specific rules, statutes, or cases cited by a party. If an assertion raised by a party can fairly be said to implicate a rule of law or legal precedent known by a court to be applicable, it is not foreclosed from considering that legal precept solely because that precise case, rule, or statute was not cited.

*In re T.P.*, 78 A.3d 1166, 1171 (Pa. Super. 2013) (citing *Commonwealth v. Hernandez*, 935 A.2d 1275, 1290 n. 3 (Pa. 2007) (Castille, J., concurring)). (This case is cited as persuasive authority pursuant to *Lerch v. Unemployment Comp. Bd. of Rev.*, 180 A.3d 545 (Pa. Cmwlth. 2018).) *See also Heinly v. Com.*, 621 A.2d 1212, 1217 (Pa. Cmwlth.1993) (finding that complaint sufficiently alleged a claim under 42 U.S.C. § 1983, although the complaint did not specify the constitutional rights that were allegedly violated, where the facts as pleaded were sufficient to implicate federal rights guaranteed under the Fourth and Fourteenth Amendments to the United States Constitution).

The non-delegation doctrine aims as preventing the legislature from abdicating its constitutional legislative responsibility by conferring upon a person or entity not within the legislature's control or oversight unfettered discretion to make unilateral policy or legislative decisions. *See City of Lancaster v. Pa. Pub. Util. Comm'n*, 313 A.3d 1020, 1025 (Pa. 2024) (explaining that a statute violates the non-delegation doctrine when it allows an improper transfer of legislative power, lacks basic policy direction, or fails to set adequate standards to guide the delegated authority) (quoting *City of Lancaster v. Pa. Pub. Util. Comm'n,* 284 A.3d 522, 528 (Pa. Cmwlth. 2022); *Protz v. Workers' Comp. Appeal Bd. (Derry Area Sch. Dist.)*, 161 A.3d 827, 833-34 (Pa. 2017)) (additional citations omitted). That is exactly what Act 40 does by allowing the Special Prosecutor to decide what is "within" SEPTA, and this is the fair import of the DA's argument.

impermissible delegation of legislative power." *Archer v. Rockwood Area Sch. Dist.*, 249 A.3d 617, 624 (Pa. Cmwlth. 2021) (quoting *In re Weaverland Indep. Sch. Dist.*, 106 A.2d 812, 813-14 (Pa. 1954)). Both our Supreme Court and this Court have reasoned that a statute may survive a vagueness challenge where "the comprehensive words of the statute . . . convey concrete impressions to the ordinary person . . . ." *Pinnacle Health Sys. v. Dep't of Pub. Welfare*, 942 A.2d 189, 192 (Pa. Cmwlth. 2008) (quoting *Commonwealth v. West*, 411 A.2d 537, 540 (Pa. Super. 1979) (additional citation omitted)).

Here, Act 40's reference to crimes occurring "within" SEPTA is impermissibly vague in prescribing the extent to which the Special Prosecutor may preempt the DA's jurisdiction. SEPTA is an agency. It is an entity. It is not a specific place or a tangible thing. The meaning of "within" in relation to SEPTA conveys no concrete impression to the ordinary person; it is simply incomprehensible. There is no way to determine what property falls "within a public transportation authority . . . ," *i.e.*, "within" SEPTA. This undefined scope of jurisdiction does not set a policy or provide any guidance for when the Special Prosecutor may act by either geographical location, type of crime committed, or otherwise. There is no way for the Attorney General (AG), the Special Prosecutor, SEPTA, or the DA to determine how the legislature intended that term to apply. As the DA points out, Act 40 does not define whether "within" SEPTA includes any or all of SEPTA headquarters, stations, trains, buses, bus stops, bus routes, train tracks, and rights-of-way. Similarly, Act 40 does not specify whether crimes in locations such as property leased to SEPTA, crimes on property subject to easements in favor of SEPTA, crimes commenced in one location and completed in another, or crimes where alleged perpetrators act in one location and flee to another, are crimes committed "within" SEPTA.

As this Court has explained,

when the General Assembly assigns any authority or discretion to execute or administer a law, "the Constitution imposes two fundamental limitations. First, . . . the General Assembly must make 'the basic policy choices,' and second, the legislation must include 'adequate standards which will guide and restrain the exercise of the delegated administrative functions.'" [*Protz v. Workers' Comp. Appeal Bd. (Derry Area Sch. Dist.)*, 161 A.3d 827 (Pa. 2017)] (quoting [*Pennsylvanians Against Gambling Expansion Fund, Inc. v. Commonwealth*], 877 A.2d [383,] 418 [Pa. 2005]). As the [Pennsylvania Supreme] Court observed . . . , a permissible delegation of legislative authority must "include concrete measures to channel the [delegatee's] discretion, . . . safeguards to protect against arbitrary, ad hoc decision making, such as a requirement that the [delegatee] hold hearings, allow for public notice and comment, or explain the grounds for its [decisions] in a reasoned opinion subject to judicial review." [*Protz*], 161 A.3d at 835 (citing and discussing *W. Phila. Achievement Charter Elementary Sch. v. Sch. Dist. of Phila.*, 132 A.3d 957 (Pa. 2016)).

*Phantom Fireworks Showrooms, LLC v. Wolf*, 198 A.3d 1205, 1227 (Pa. Cmwlth. 2018). Here, Act 40 gives the Special Prosecutor unfettered discretion with no guidance from the legislature, contrary to *Phantom Fireworks* and *Protz*. Accordingly, I would grant summary relief on this claim.[3]

## Criminal Defendants' Due Process Rights

Contrary to the AG's argument, the DA has standing in this matter to assert criminal defendants' due process rights regarding Act 40. The AG argues, without citing any authority, that "[i]f the [DA] is doing his job, his interests – as prosecutor – are directly adverse to the interests of criminal defendants [and his] only interests would be in prosecuting those same defendants for crimes." Br. of AG at 32. This assertion constitutes a serious mischaracterization of a prosecutor's role. Rule 3.8 of the Pennsylvania Rules of Professional Conduct imposes special

---

[3] I do not address the other claims made by the DA as I find the improper delegation of legislative authority to be a fatal defect of Act 40.

obligations on prosecutors and includes an Explanatory Comment explaining that "[a] prosecutor has the responsibility of *a minister of justice and not simply that of an advocate*. This responsibility carries with it *specific obligations to see that the defendant is accorded procedural justice . . . .*" Pa.R.P.C. 3.8, Explanatory Comment 1 (emphasis added); *see also Commonwealth v. Clancy*, 192 A.3d 44, 52-53 (Pa. 2018) (explaining that "[t]he prosecutor must ensure that 'the defendant is accorded procedural justice . . .'") (first quoting Pa.R.P.C. 3.8 cmt. 1; then citing MODEL RULES OF PRO. CONDUCT 3.8 cmt. 1 (AM. BAR ASS'N 2015)). Similarly, our Supreme Court has observed that

> [b]ecause it is her duty both to respect the rights of the defendant and to enforce the interests of the public, the prosecutor "is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer . . . ."

*Clancy*, 192 A.3d at 52 (quoting *Berger v. U.S.*, 295 U.S. 78, 88 (1935)).

Act 40 expressly provides that criminal defendants cannot assert any challenge to the Special Prosecutor's exercise of jurisdiction over their cases. However, improper exercise of jurisdiction over criminal defendants and their cases would violate their due process rights. Therefore, the DA has standing to challenge legislation that infringes the procedural constitutional rights of criminal defendants.

Moreover, although "one ordinarily has no standing to vindicate the constitutional rights of third persons," the United States Supreme Court in *Singleton v. Wulff*, 428 U.S. 106 (1976) isolated two elements that could create an exception: "(1) the relationship of the litigant to the third party is such that enjoyment of the right by the third party is inextricably bound up with the activity the litigant seeks to pursue; and (2) there is some obstacle to the third party's assertion of his own right." *Phila. Facilities Mgmt. Corp. v. Biester*, 431 A.2d 1123, 1131-32 (Pa. Cmwlth. 1981) (citing *Singleton*) (additional citation omitted).

As discussed above, a prosecutor has a responsibility to protect the constitutional rights of criminal defendants. Therefore, safeguarding defendants' procedural rights is inextricably bound up with the DA's professional activities. Indeed, he arguably has an affirmative duty to challenge the validity of legislation that infringes the constitutional rights of criminal defendants. Accordingly, the first *Singleton* factor is met here.

As for the second factor, the obstacle to criminal defendants' assertion of their own constitutional rights is evident on the face of Act 40, in its provision precluding any criminal defendant from challenging the Special Prosecutor's takeover of the prosecution of the defendant's case. 74 Pa.C.S. § 1786(a)(5). Thus, the second *Singleton* factor is also met here. Accordingly, the DA also has standing under *Singleton* and *Biester*.

Regarding the merits of the DA's argument, he is correct that this provision facially violates article I, section 9 of the Pennsylvania Constitution, which provides that "[i]n all criminal prosecutions the accused hath a right to be heard by himself and his counsel." PA. CONST. art. I, § 9. It also improperly limits judicial scrutiny, in violation of article V, section 1, which vests the judicial power of the Commonwealth in the Unified Judicial System. PA. CONST. art. V, § 1; *accord Robinson Twp., Wash. Cnty. v. Commonwealth*, 83 A.3d 901 (Pa. 2013) (upholding judicial authority to review a statute's constitutionality and observing, *inter alia*, that "the Commonwealth [did] not identify any provision of the Constitution which grants it authority to adopt non-reviewable statutes . . ."). Act 40 facially and improperly restricts a defendant's right to challenge its constitutionality.

Moreover, notwithstanding that the Special Prosecutor's authority extends only to crimes committed "within" SEPTA, 74 Pa.C.S. § 1786(a)(2), that limit is meaningless if no defendant can challenge the Special Prosecutor's authority on the basis that the alleged crime was not committed within SEPTA. This is

particularly so because whether a given crime is "within" SEPTA is incomprehensibly vague; if no defendant can question its application, the Special Prosecutor will, practically speaking, have sole discretion as to its meaning and breadth, without the possibility of judicial review. Accordingly, Act 40 is unconstitutional.[4]

        For these reasons, I respectfully dissent in part from the majority opinion.

_____
CHRISTINE FIZZANO CANNON, Judge

President Judge Cohn Jubelirer joins in this concurring and dissenting opinion.

---

[4] If this were Act 40's only constitutional infirmity, I would agree with the majority that this provision is severable. However, as I find the statute's improper delegation of legislative authority to be a fatal defect, severing this provision cannot save Act 40.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Larry Krasner, in his official capacity : 
as the District Attorney of Philadelphia; : 
Office of the District Attorney, City of : 
Philadelphia, : 
                Petitioners : 
                              : 
           v. : No. 8 M.D. 2024
                              : 
Michelle A. Henry, in her : 
official capacity as Attorney : 
General of Pennsylvania, : 
                Respondent : Argued: April 10, 2024

BEFORE:   HONORABLE RENÉE COHN JUBELIRER, President Judge
              HONORABLE PATRICIA A. McCULLOUGH, Judge
              HONORABLE ANNE E. COVEY, Judge
              HONORABLE CHRISTINE FIZZANO CANNON, Judge
              HONORABLE ELLEN CEISLER, Judge
              HONORABLE LORI A. DUMAS, Judge
              HONORABLE MATTHEW S. WOLF, Judge

DISSENTING OPINION
BY JUDGE WOLF               FILED: June 14, 2024

      I agree with the learned Majority's dispositions of standing, ripeness, and the intervention of the Southeastern Pennsylvania Transportation Authority (SEPTA). But I must respectfully dissent from the Majority's conclusion that the Act of December 14, 2023, P.L. 369, No. 40, 74 Pa.C.S. § 1786 (Act 40), survives the constitutional challenges presented here. After careful review, I conclude that Act 40 unconstitutionally divests Philadelphia County District Attorney Larry Krasner (District Attorney Krasner) of his territorial jurisdiction and his core function as the official elected by the people of Philadelphia to prosecute crime. Further, I believe Act 40 violates the equal protection guarantees of the Pennsylvania

Constitution and is an unconstitutional special law, notwithstanding that it applies to Philadelphia.

## I. Territorial Jurisdiction and Prosecutorial Function (Claims I and II)

The Majority correctly notes[1] the presumption of constitutionality, and that we uphold a law unless it "clearly, palpably, and plainly" violates the Constitution. *DeFazio v. Civ. Serv. Comm'n of Allegheny Cnty.*, 756 A.2d 1103, 1105 (Pa. 2000). The Court's duty is to assess whether the challenger has overcome that presumption. *Germantown Cab Co. v. Phila. Parking Auth.*, 206 A.3d 1030, 1041 (Pa. 2019). To do so, courts interpret the Pennsylvania Constitution using its plain language, which is "the embodiment of the will of the voters who adopted it" and the best indication of how they understood its meaning, which controls. *Allegheny Reprod. Health Ctr. v. Pa. Dep't of Hum. Servs.*, 309 A.3d 808, 849 (Pa. 2024) (quoting *Washington v. Dep't of Pub. Welfare*, 188 A.3d 1135, 1144 (Pa. 2018)). Courts also consider history, constitutional structure, and, to some extent, prior judicial decisions for guidance and context in interpreting the text. *See id.* at 869, 881-82; *McLinko v. Dep't of State*, 279 A.3d 539, 581 (Pa. 2022), *cert. denied sub nom. Bonner v. Chapman*, 143 S. Ct. 573 (2023); *McLinko,* 279 A.3d at 583 (Wecht, J., concurring) ("The value of consistency in constitutional interpretation militates in favor of preserving and faithfully applying this Court's past interpretations of our Constitution.").

Local prosecution of crime is so obvious, so engrained in Pennsylvania's (and every other State's) constitutional text and structure, that our courts have rarely explained it. Article IX, Section 4 of the Pennsylvania Constitution requires that "[c]ounty officers shall consist of . . . district attorneys."

---

[1] Maj. Op. at 17-18.

PA. CONST. art. IX, § 4. "A district attorney is a constitutional officer, elected by the people of the county which he serves." *McGinley v. Scott*, 164 A.2d 424, 431 (Pa. 1960); *see also Commonwealth v. Wardlaw*, 249 A.3d 937, 954 (Pa. 2021) (Dougherty, J., concurring) (collecting constitutional and statutory bases for district attorneys, and explaining that "[t]hese district attorneys and their assistants generally prosecute criminal cases which arise in the county from which the district attorney is elected"); *Commonwealth ex rel. Krasner v. Att'y Gen.*, 309 A.3d 265, 276 (Pa. Cmwlth. 2024) (reviewing history of district attorneys in Pennsylvania and opining that "district attorneys are the primary authority for criminal prosecution" with only "very specific exceptions").

This remains true in Philadelphia notwithstanding the City's consolidation with the County of Philadelphia and adoption of Philadelphia's home rule charter (Charter). Post-consolidation, Article IX (relating to local government) was amended in the 1968 Convention to "except a county which has adopted a home rule charter" from provisions regulating the selection and pay of county officers. PA. CONST. art. IX, § 4. Philadelphia kept the power to select the constitutional officers it had before, but would now do so by virtue of its Charter. PA. CONST. art. II, § 2; *Pa. Rest. & Lodging Ass'n v. City of Pittsburgh*, 211 A.3d 810, 816-17 (Pa. 2019). The way of choosing and regulating those officers may have changed to be subject to the Charter, but the fundamental constituent offices and their functions—including locally elected district attorneys prosecuting crime—did not. *See Lennox v. Clark*, 93 A.2d 834, 837-41 (Pa. 1953).

The Philadelphia District Attorney has a constitutional role—textually, structurally, historically—long discussed by our courts, more fundamental than the Charter. In fact, our Supreme Court has already concluded that "the [Philadelphia

D]istrict [A]ttorney is essentially a state officer whose powers, duties and functions are not affected by the Charter." *Com. ex rel. Specter v. Freed*, 228 A.2d 382, 386 (Pa. 1967); *see also Com. ex rel. Specter v. Martin*, 232 A.2d 729, 736 (Pa. 1967) ("[T]he District Attorney of Philadelphia does not perform any municipal functions and his duties involve only his representation of the Commonwealth.") (plurality op.). The Justices in *Freed* and *Martin* fractured over a smaller question not at issue here: whether the City—or only the General Assembly—could modify the duties or regulate the tenure in office of the Philadelphia District Attorney. But no one, for all their ink,[2] thought the General Assembly could give away the District Attorney's prosecutorial role to an out-of-City official unelected by the people of Philadelphia. The home-rule provisions in Article IX plainly guarantee to the City, equally to every county in the Commonwealth, a district attorney who can wield prosecutorial discretion over the polity who elected him free from unelected interlopers. As a general constitutional matter, crime in this Commonwealth is prosecuted by a locally elected official.

---

[2] The vociferous separate writings in *Martin* and *Freed* agree that the Philadelphia District Attorney in particular—and no one else—is to prosecute general crime in Philadelphia under our Constitution. *See Freed*, 228 A.2d at 398-99 (Bell, C.J., dissenting) ("[I]t is clear as crystal that the essential . . . powers, functions, [and] duties . . . of (a District Attorney, and especially of) a District Attorney of Philadelphia, are primarily and principally those of a County officer . . . prosecuting criminals who commit one or more crimes in Philadelphia" and "[i]t is a matter of common knowledge that the District Attorney or his assistants, and not the City Solicitor (or his assistants), tries every criminal case in the trial Courts, and, in the event of appeal, argues such cases in the appellate Courts."); *Martin*, 232 A.2d at 742 (Bell, C.J., dissenting) ("The District Attorney of Philadelphia (1) is Elected, and (2) is Paid—not by the Commonwealth but—By the people of Philadelphia, and (3) His essential . . . powers, functions, duties, limitations and boundaries involve only crimes committed, not throughout the Commonwealth, but only in the City of Philadelphia."); *see also Martin*, 232 A.2d at 747, 755 (Op. of Musmanno, J.) (warning that, as a constitutional matter, the "District Attorney [has] *the whole* prosecution machinery at his command" and that "the *unlimited* prosecuting powers [are] lodged in the office of District Attorney" (emphasis added)).

MSW-4

It is not clear to me how much of District Attorney Krasner's prosecutorial jurisdiction Act 40 purports to wrest from him. But it is substantial. The Act addresses crimes "occurring within a public transportation authority," obviously referring to SEPTA. 74 Pa.C.S. § 1786(a). An "authority" is a "body corporate and politic" created by law. *Id.* § 1701 (definitions). Aside from District Attorney Krasner's half-serious observation that Act 40 is best construed as referring only to white-collar crimes *by* SEPTA, *see* Petitioners' Memo of Law in Support of Summary Relief at 30 n.5, no one knows how far the statute goes. Does it mean, as the parties have argued, crime committed *on SEPTA property*, or *within a certain distance from SEPTA property*, to impermissibly insert words into the statute? *See Ursinus Coll. v. Prevailing Wage Appeals Bd.*, 310 A.3d 154, 171 (Pa. 2024). What about crime *on property leased, licensed, or traversed, but not owned, by SEPTA*? Regardless, accepting that it must mean something, on the undisputed factual record at this summary stage, Act 40 sweeps broadly, covering at least the 8,700 bus, trolley, and train stops SEPTA operates. It would shift a substantial portion of prosecution of Philadelphia's crime *in general* from District Attorney Krasner to the special prosecutor.

This is no more defensible under Article IX than abolishing the office of district attorney wholesale. Consider a hypothetical statute allowing unilateral peremptory jurisdiction by the Attorney General over any crime occurring "within a state highway" of the Commonwealth. This, like Act 40, does not target any particular *type* of crime. It would strip county district attorneys of substantial portions of their jurisdiction over the prosecution of *general* crime (all or most DUIs and drug-trafficking crimes, for example) on a purely geographic basis. This would,

like Act 40, plainly and palpably violate Article IX's guarantee of locally elected district attorneys.

Realizing this, the Majority adopts[3] the Attorney General's most developed response on this issue—that Act 40 does not really displace District Attorney Krasner's territorial jurisdiction at all but merely "regulates" him in exercising it. Our courts have recognized that the General Assembly can regulate district attorneys, but Act 40 does not fit constitutionally within that supervisory power. The General Assembly can "control the officer" or "punish . . . misconduct," or address neglect of duty or conflict of interest. *Commonwealth v. McHale*, 97 Pa. 397 (1881). But this is always limited to *a particular case* and always subject to *judicial review*. *In re Shelley*, 2 A.2d 809, 811-12 (Pa. 1938).

The Attorney General urges us to apply *Shelley*. There, our Supreme Court upheld a statute—Act 3 of 1938[4]—allowing the Attorney General to supersede district attorneys. But as the Court explained, the statute also required judicial review in the particular matter to ensure that the decision to supersede the district attorney was not an abuse of discretion. The statute limited displacement of the district attorney by the Attorney General to "*the* investigation or proceeding," i.e., a particular proceeding already pending before a "court of oyer and terminer" or a "court of quarter sessions," and required the tribunal hearing the proceeding to adjudicate whether the supersession was an abuse of discretion. *Shelley*, 2 A.2d at 811-12 (quoting statute) (emphasis added). Thus even though the *Shelley* Court upheld the statute, it crafted a procedural remedy to keep the statute on the right side of the Constitution: on remand, the Attorney General must "present to the court his reasons for superseding the district attorney, *with the right to the latter to be heard*

---

[3] Maj. Op. at 23-24, 30-32.
[4] Act of July 30, 1938, P.L. 17, repealed by the Act of March 20, 1939, P.L. 8.

MSW-6

*thereon*, [and] the court thereupon . . . determine the question whether the district attorney has been superseded by a *valid* exercise of the legal discretion vested in the Attorney General." *Id.* at 814 (emphasis added).

Later, our Supreme Court examined another supersession statute, which was a predecessor to the Commonwealth Attorneys Act. *See Commonwealth v. Schab*, 383 A.2d 819, 821 (Pa. 1978). But that statute also limited supersession to particular cases and required judicial review.[5] A plurality of the Court observed that "[i]t would be incongruous to place the district attorney in the position of being responsible to the electorate for the performance of his duties while actual control over his performance was, in effect, in the Attorney General." *Id.* at 822. This was "precisely the approach rejected in Pennsylvania by [the statute creating locally elected district attorneys in 1850] *and constitutionally in 1874*." *Id*. (emphasis added). *Schab* is a plurality decision, but like so many of our Supreme Court's supersession cases, reading the minority opinions reveals some radical agreement. Two Justices joined a separate opinion explaining their view that the basic issue was "[w]hether the Attorney General *has abused his discretion* in seeking to supersede the district attorney" and that "the authoritative application of [that standard] is for the courts." *Schab*, 383 A.2d at 831 (Op. of Pomeroy, J.) (emphasis added) (citing *United States v. Nixon*, 418 U.S. 683, 692-98 (1974)). *Schab* confirms the reasoning

---

[5] Section 205 of the current Commonwealth Attorneys Act, Act of October 15, 1980, P.L. 950, *as amended*, 71 P.S. § 732-205, includes similar protections. It directs the Attorney General to prosecute several discrete, narrow classes of crimes (such as those committed by state officials in the course of their duty, or involving corrupt organizations). *Id.* § 732-205(a)(1)-(2). For supersession of a district attorney for criminal prosecution generally, the Attorney General must "petition the court having jurisdiction" of the matter, a judge must "hear the matter," and supersession must be allowed only when the evidence shows the district attorney "has failed or refused to prosecute and such failure or refusal constitutes abuse of discretion." *Id.* § 732-205(a)(4).

in *Shelley*: discretion to supersede the district attorney must be judicially reviewable in order to be constitutional. And it must be limited to particular cases where the discretion to supersede can be meaningfully reviewed.

Act 40 is nothing like the supersession statutes in *Shelley* and *Schab*, or the modern Commonwealth Attorneys Act. It contains no process for reviewing the special prosecutor's decision to assert preemptive jurisdiction, let alone any opportunity for District Attorney Krasner to be heard on that question, as the *Shelley* Court conspicuously required. There is no way to say whether the special prosecutor's assertion of jurisdiction is "valid," *Shelley*, 2 A.2d at 814, because Act 40 does not care whether it is valid. The removal of jurisdiction from District Attorney Krasner is categorical and "at the sole discretion of the special prosecutor," 74 Pa.C.S. § 1786(a)(4)(i). District Attorney Krasner cannot be heard. *Id.* § 1786(a)(4)(v). There is no review during the ensuing criminal proceedings, *id.* § 1786(a)(5), and no judicial review at all. Act 40 abandons the sort of case-by-case, reviewable "control [of] the officer" upheld in *Shelley* for an unconstitutional "replace the officer" framework. And the replacement is unilateral and nonconcurrent for District Attorney Krasner, but for no one else. *Compare* 74 Pa.C.S. § 1786(a)(4)(iii) (allowing other county district attorneys to "accept[]" special prosecutor jurisdiction), *with* (v) ("[P]rior approval of the district attorney of [Philadelphia] shall not be required.").

Because Act 40 allows unilateral displacement of District Attorney Krasner's constitutional function by an unelected official, without judicial review in any particular case, I would hold that Act 40 clearly, plainly, and palpably violates Article IX of the Pennsylvania Constitution.

## II. Special Law and Equal Protection (Claims III and IV)

Act 40 also violates the equal protection guarantees found in Article III, Section 32[6] and Article I, Section 26[7] of the Pennsylvania Constitution. Article III, Section 32 is a primary source of Pennsylvania equal protection principles and requires "that like persons in like circumstances will be treated similarly." *DeFazio v. Civ. Serv. Comm'n of Allegheny Cnty.*, 756 A.2d 1103, 1106 (Pa. 2000) (quoting *Curtis v. Kline*, 666 A.2d 265, 267-68 (Pa. 1995)). In the context of laws aimed at a specific local office, our Supreme Court has held that the no-special-laws clause

> does not preclude the Commonwealth from resorting to legislative classifications, provided that those classifications are *reasonable rather than arbitrary* and bear *a reasonable relationship to the object of the legislation*. In other words, a classification must rest upon some ground of difference which justifies the classification and have a fair and substantial relationship to the object of the legislation.

*Id.* (emphasis added). Even if the classification meets that test, the class it creates "must be open, that is, it must be so defined that other members can come in." *Pa. Interscholastic Athletic Ass'n, Inc. v. Campbell*, 310 A.3d 271, 282 (Pa. 2024) (hereinafter, *PIAA*). It is not enough for the class to be nominally or fictitiously open; if it "is closed *or substantially closed* to future membership [then it] is *per se* unconstitutional." *W. Mifflin Area Sch. Dist. v. Zahorchak*, 4 A.3d 1042, 1048 (Pa. 2010). Our Supreme Court rejects "attempt[s] by the General Assembly to

---

[6] This Section initially requires that "[t]he General Assembly shall pass no local or special law in any case which has been or can be provided for by general law." PA. CONST. art. III, § 32. It then specifically enumerates seven types of prohibited special law, including laws "[r]egulating the affairs of counties, cities, townships, wards, boroughs or school districts . . . ." *Id.*

[7] It provides: "Neither the Commonwealth nor any political subdivision thereof shall deny to any person the enjoyment of any civil right, nor discriminate against any person in the exercise of any civil right." PA. CONST. art. I, § 26.

evade the constitutional prohibition by cleverly defining a closed class of one or a handful of entities in seemingly general terms." *PIAA*, 310 A.3d at 282-83.

This matter is squarely analogous to *DeFazio*, 756 A.2d at 1103. There, the Court also faced the issue whether legislation violated the no-special-laws clause. In that case, the statute required sheriffs of second class counties (*i.e.*, Allegheny County) to abide by certain hiring and promotion procedures and limited the political activities of sheriff's office employees. The Sheriff of Allegheny County sought to enjoin enforcement, arguing that the statute was directed specifically at his office. The trial court declared the legislation unconstitutional and issued a permanent injunction. The Pennsylvania Attorney General's Office, as intervenor, brought an appeal to the Pennsylvania Supreme Court.[8]

On appeal, the Pennsylvania Supreme Court rejected the Attorney General's argument that Allegheny County's classification as a second class county, as well as the unique function of its sheriff's office, justified treating it differently than other similar sheriffs' offices throughout the Commonwealth, stating:

> [T]he legislation in question goes beyond merely singling out Allegheny County as a class to be treated differently and in essence has effectively created a new sub-classification, that of the sheriffs of second class counties. Plainly such a sub-classification bears no relationship either to the distinction of Allegheny County as a county of the second class or to any unique function of the office of county sheriff.
>
> . . . .
>
> While the legislature can treat different classes of counties differently, that is not what has occurred here. One particular county officer may not be treated differently from other similar officers throughout the commonwealth

---

[8] *See* 42 Pa.C.S. § 722(7).

merely because that officer is within a certain class of county. The distinction created by this legislation bears no fair or reasonable relationship to the object of the legislation and bears no relationship to the distinction of Allegheny County as a county of the second class.

*DeFazio*, 756 A.2d at 1106.

We face the identical situation here. The Attorney General argues:

Act 40's focus on "the county of the first class" – currently only Philadelphia – is reasonably related to ensuring that crime committed on SEPTA is prosecuted. *See DeFazio*, 756 A.2d at 1106. The Legislature found that, during [District Attorney] Krasner's time as District Attorney, violent crime in Philadelphia increased and the economy in Philadelphia decreased due to policies enacted by Petitioners. *See* Select Committee on Restoring Law and Order, *Second Interim Report*, (October 24, 2022), https://www.pahousegop.com/Display/SiteFiles/1/2022/S elect%20Committee%20on%20Restoring%20Law%20an d%20Order%202ndInterim%20Report%20102422.pdf [(Second Interim Report)]. Act 40 was enacted in response to the hike in violent crime in recent years, endangering the safety and welfare of SEPTA riders in Philadelphia.

Act 40 treats the county of the first class differently than other counties because the problem being addressed is different among the counties. And it treats the Philadelphia District Attorney differently than other district attorneys because the General Assembly found that violent crimes were not being adequately prosecuted on SEPTA. Act 40's classifications are reasonably related to the health and safety goals being addressed by the law.

Attorney General's Brief in Support of Cross Application for Summary Relief at 20.

Thus, the Attorney General concedes that Act 40 singles out the locality of Philadelphia and then creates a sub-classification—the office of Philadelphia District Attorney—within that locality, just like the unconstitutional statute in

MSW-11

*DeFazio*. But Act 40 heaps on more classifications. It applies only to SEPTA-related crime. Tellingly, the Act sunsets a year after the end of District Attorney Krasner's current term and precludes any person who served in the Philadelphia District Attorney's Office since mid-December 2017—essentially since the beginning of Krasner's tenure—from becoming the special prosecutor. 74 Pa.C.S. § 1786(a)(1)(iii), (8). Thus, Act 40 creates a substantially closed class of one, limited in time—past and future—so that it substantially applies only to District Attorney Krasner and no other incumbent of that office. Act 40's classification is of a single incumbent of a single public office in a single political subdivision, and based on, of all things, the geographic location of transportation infrastructure. Its effects are purposefully walled off in seemingly neutral terms. *See PIAA*, 310 A.3d at 282-83.

The Second Interim Report, on which the Attorney General relies, mentions SEPTA *just once*. The focus is not at all on SEPTA, which is only mentioned in passing; rather, the gist of the report is that District Attorney Krasner, through his policies, is *causing* an increase in crime in Philadelphia. In fact, the report explicitly states: "Apparently blinded by the goal of implementing progressive policies at any cost, [District Attorney] Krasner has contributed to a catastrophic rise in violent crime at the expense of public safety." Second Interim Report at 21. Consistent with this, at oral argument, the sole basis the Attorney General and SEPTA articulated for Act 40 is "public safety" in general. The Act itself does not contain any statement of its purpose, which makes it difficult to review whether that purpose is rationally related to its classifications.

Even though the Court could imagine public safety as a legitimate public purpose, the problem for Act 40 is that its classifications are "arbitrary" and

"bear[] no fair or reasonable relationship to" that purpose. *DeFazio*, 756 A.2d at 1106. If Act 40 is based on *SEPTA* crime, its differential treatment of Philadelphia vis-à-vis the suburban counties is arbitrary—it treats differently other district attorneys who are exactly similarly situated because SEPTA, an undifferentiated regional authority, operates in their counties too. If, on the other hand, Act 40 is based on *Philadelphia* crime, its restriction to SEPTA is arbitrary. And more critically, it impermissibly singles out a particular incumbent of a sub-classification (i.e., a single office) for differential treatment, even though Philadelphia's crime problem is not related to any "unique characteristic of that particular office." *See DeFazio*, 756 A.2d at 1106. Either way, Act 40's singling-out bears no reasonable relationship to any unique aspect of the singled-out office. There is no "ground of difference" to support its differential treatment of the Philadelphia District Attorney. *Id.*

The Attorney General argues Article IX, Section 13(b)[9] allows Act 40, even though it would otherwise be an unconstitutional special law, because Act 40 applies, in part, to Philadelphia. She claims all that is necessary to allow a special law is that it "regulate[] the affairs" of the City, citing in support *Clark v. Meade*, 104 A.2d 465, 467-68 (Pa. 1954). But *Meade* is neither binding nor supportive of that proposition. And even if it were, Act 40 does *not* "regulat[e] the affairs" of the City of Philadelphia, when that phrase is correctly interpreted.

Take constitutional history first, which the parties and the Majority all but ignore.[10] The current Article IX, Section 13(b) did not originate in the 1968

---

[9] Article IX, Section 13(b) provides that "Local and special laws, regulating the affairs of the City of Philadelphia and creating offices or prescribing the powers and duties of officers of the City of Philadelphia, shall be valid notwithstanding the provisions of section 32 of Article III of this Constitution." PA. CONST. art. IX, § 13(b).

[10] *But see* Maj. Op. at 31 n.24 (referencing the 1968 Constitution in a single sentence).

Constitution, and it was addressing a former—and different—no-special-laws clause. It was this pre-1968 Constitution that *Meade* discussed. The no-special-laws clause "was originally added to the Constitution in 1874." *PIAA*, 310 A.3d at 282. But the 1874 clause did not forbid special laws generally like our Constitution does today; rather, it enumerated "28 subjects" in the clause in Article III, Section 7 (later to be substantially amended and renumbered as Article III, Section 32).[11] *Meade*, 104 A.2d at 467 (citing PA. CONST. art. III, § 7 (1874)). Of those 28 forbidden types of special law, 2 were laws "*regulating the affairs of . . . cities*" and "*creating offices or prescribing the powers and duties of officers, in . . . cities.*" PA. CONST. art. III, § 7 (1874). In 1951, the City adopted home rule and Pennsylvania voters passed what is commonly called the City-County Consolidation Amendment to the Pennsylvania Constitution. *See Meade*, 104 A.2d at 467. This created the constitutional exception now found in Article IX, Section 13(b) (then-Article XIV, Section 8) that allowed some special laws for the City specifically. But when it was enacted, the exception was limited to the above-quoted two types of special laws. At the time, this left 26 types of special laws still prohibited in the then-applicable no-special-laws clause, *even for the City of Philadelphia*.

Meade makes sense only with that historical context. Confronted with an unquestionably special law pertaining to Philadelphia, the *Meade* Court noted that "[t]he other prohibitions of [the 1874 no-special-laws clause] are deliberately omitted [from the exception that would become Article IX, Section 13(b)], which confirms . . . that . . . the City-County Consolidation Amendment did not intend to alter, in any way the [26] remaining restraints of [the no-special-laws clause]." *Meade*, 104 A.2d at 467. Three of the four Justices in the *Meade* majority concurred

---

[11] The Constitution of 1874 was extensively amended, modified, and renumbered during the events culminating in the Constitution of 1968. *See* PA. CONST. (1968) (Note).

to note that the Court there "[was] not passing, either expressly *or impliedly*, upon the general power of the legislature to enacts laws regulating the affairs of the City." *Id.* at 468 (emphasis added) (Stern, Jones, and Chidsey, JJ., concurring). Thus, *Meade* is of zero value in determining whether, as the Attorney General argues, any law "regulating the affairs of the City" is constitutional. *Meade* involved a law that clearly violated other of the 28 express prohibitions in the no-special-laws clause that were not written into the Section 13(b) exception and thus remained prohibited. I would heed the Justices' careful warning not to apply *Meade* beyond that situation, and would read it instead against its facts.

Unlike the Constitution at issue in *Meade*, the modern no-special-laws clause has a general prohibition on special laws, and retains only 7—not 28—specifically enumerated prohibitions. PA. CONST. art. III, § 32. Curiously, one of the specific prohibitions retained is for laws "regulating the affairs of . . . cities," with a concomitant exception for Philadelphia in Article IX, Section 13(b); but the other exception still found in Article IX, Section 13(b)—for laws creating offices or prescribing powers and duties—is now missing its historical predicate in the current no-special-laws clause. *Meade* obviously cannot make sense of the current Article IX, Section 13(b) given the intervening constitutional change.

In my view, this history is a basis for rejecting District Attorney Krasner's textual argument that the *and* between the two Section 13(b) clauses requires that both be satisfied to trigger the exception. But that does not mean, as the Attorney General argues, that Act 40 is valid because it either "regulat[es] the affairs" of Philadelphia—which is what the Attorney General principally argues—

MSW-15

or because it "prescrib[es] the powers and duties of officers of" the City, as the Majority holds.[12]

First, regarding Article IX, Section 13(b)'s "regulat[e] the affairs" clause, as discussed, *Meade* expressly disclaimed any interpretation of that clause and no other decisional law addresses it. Left with the text of the Constitution alone, which is our principal guide anyway, the Attorney General relies principally on this clause for the exception but fails to read the clause together with the general prohibition on special laws, and as being addressed only to a specifically enumerated type of special law, which it is. If any law that *applies to* Philadelphia also "regulat[es] the affairs" of Philadelphia, then Philadelphia has no protection from any kind of special or local law. The exception would swallow the general rule. This would invite constitutional gamesmanship: all the General Assembly need do to pass a special law is somehow include something about Philadelphia. That cannot be what Section 13(b) means because it carefully enumerated only two types of special law as being permitted for Philadelphia. It did not globally allow all special laws. I would give effect to that clear original public meaning.

Act 40 does not regulate the affairs of the City of Philadelphia. First, it applies by its terms outside Philadelphia also. Second, it is directed nominally at a regional transportation authority that transcends the City. Third, it actually addresses district attorneys, including, but not exclusively, the Philadelphia District Attorney. As discussed *supra*, the district attorney is more akin to a statewide official serving a function for which our Constitution separately provides, and for which District Attorney Krasner is politically accountable to the people of Philadelphia. His work transcends the City's affairs.

_____

[12] Maj. Op. at 33-34.

Further, Act 40 does not "prescrib[e] the duties and powers of officers in" the City as that clause must be interpreted. This is for principally the same reasons as for the "regulat[e] the affairs" clause. The powers-and-duties clause creates a limited exception, not a general one, and must not be understood in a way that would destroy the no-special-laws clause in Philadelphia, since it still generally applies. Existing statutes and the Constitution "prescrib[e] the duties and powers" of the Philadelphia District Attorney. Act 40 barely modifies them. The Majority acknowledges this.[13] Thus, Act 40 itself furnishes a prime example of the kind of circumvention that would ensue if any law that says something about a Philadelphia official's duties can be enacted as special legislation.

Finally, the Majority turns briefly to Article III, Section 20 of the Constitution.[14] Relying on its premise that "Philadelphia is exempted from the ban on special legislation"—which, in light of the Constitution's text and history is true only specifically, *not generally*—the Majority similarly concludes that because Philadelphia is a City of its own class, it definitionally cannot be the subject of unlawfully discriminatory special legislation.[15] But obviously, the fact that legislation targets a class of one is not a panacea for equal protection violation, and the law must still survive scrutiny. *DeFazio*, 756 A.2d at 1105 (striking down statute affecting solely a county of the second class).

I would hold that Act 40's classifications are "arbitrary and bear [no] reasonable relationship to the object of the legislation." *DeFazio*, 756 A.2d at 1106.

---

[13] Maj. Op. at 33-34.

[14] It provides: "The [l]egislature shall have power to classify counties [and] cities . . . according to population, and all laws passed relating to each class, and all laws passed relating to, and regulating procedure and proceedings in court with reference to[] any class[] shall be deemed general legislation within the meaning of this Constitution." PA. CONST. art. III, § 20.

[15] Maj. Op. at 36.

MSW-17

Because this case is squarely on point with *DeFazio*, and because the obvious rationale for the classification in the legislation is to single out District Attorney Krasner, precedent requires a determination that Act 40 runs afoul of the equal protection principles of Article III, Section 32 of the Pennsylvania Constitution. Further, I would conclude that as an otherwise-unconstitutional special law, Act 40 is not authorized by Article IX, Section 13(b) of the Constitution because it is not one of the two types of special or local law expressly permitted by that provision. On those bases, I would grant District Attorney Krasner's Application for Summary Relief, deny the Attorney General's and SEPTA's, and permanently enjoin Act 40's enforcement.[16]

In writing this opinion, I do not opine, nor should I, on the wisdom of District Attorney Krasner's policies. My opinion is based on the legislation, applicable precedent, the facts of this case, and most importantly on the text and history of the Pennsylvania Constitution, which compel me to dissent from the Majority's Opinion.

_____
MATTHEW S. WOLF, Judge

President Judge Cohn Jubelirer joins in this Dissenting Opinion

---

[16] Given my conclusions on the principal constitutional challenges raised here, I do not consider District Attorney Krasner's remaining arguments.